UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

2009 DEC -8  PM 2: 27

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

| | |
|---|---|
| BRYAN J. BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| DR. ELIZABETH BOWMAN, | ) |
| TERRY HARRELL, individually and in her | ) |
| official capacity as Executive Director of | ) |
| the Judges and Lawyers Assistance Program, | ) |
| TIM SUDROVECH, individually, and in his | ) |
| official capacity as Clinical Director of | ) |
| the Judges and Lawyers Assistance Program, | ) |
| DR. STEVEN ROSS, | ) |
| JOHN DOES and JANE ROES, co-conspirators, | ) |
| And RANDALL SHEPARD, in his official | ) |
| capacity as Chief Justice of the Indiana Supreme | ) |
| Court, | ) |
| | ) |
| Defendants. | ) |
| | ) |

No.   1:09CV346 RL

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 challenging Defendants' acts committed under color of state law.  Defendants are herein alleged to have deprived Plaintiff of his civil and constitutional rights provided under the United States and Indiana Constitutions and are also alleged to have visited damages that sound in state tort and contract law.

2.      Plaintiff seeks (a) a declaration that Rule 19, Admission and Discipline, is visiting an unconstitutional prior restraint upon Plaintiff, and (b) equitable relief recalling government reports built upon unconstitutional and tortuous acts and practices and quarantining all reports arising from said unconstitutional and fraudulently obtained reports, (c) nominal, compensatory and exemplary damages, and (d) an injunction prohibiting Defendants from engaging in

unconstitutional enforcement of the challenged provisions in the future, from promulgating reports predicated upon unconstitutional acts and fraud and directing Defendants to develop and implement training and protocols which comport with constitutional requirements and protect the constitutional rights of Plaintiffs and others similarly situated.

3. This Court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331 and 1343.

4. The Court has supplemental jurisdiction over the state law based claims pursuant to 28 U.S.C. §1367.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant Dr. Steven Ross maintains an office and residence in Allen County, where the challenged testing, confiscation of work product and billing fraud alleged herein took place.

6. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202 and by Rule 57 of the Federal Rules of Civil Procedure.

7. The Attorney General of the State of Indiana has been served pursuant to since this litigation seeks a declaration of law again a law of the State of Indiana.

8. Jury trial is sought on claims in which that is applicable.

9. Plaintiff seeks damages from the health care providers named herein in an amount not greater than fifteen thousand dollars each ($15,000).

## PARTIES

10. Plaintiff Bryan J. Brown is a permanent resident of Allen County, Indiana who is admitted to the bar of the State of Kansas (1996). He is filing this action *pro se*.

11. The Chief Justice of the Indiana Supreme Court, Randall T. Shepard, is sued in his official capacity as the representative of that Honorable Court.

12. The Executive Director of the Judges and Lawyers Assistance Program, Terry Harrell, is sued in her official capacity for the policies and procedures of JLAP and acts undertaken within the scope of her employment and in her individual capacity for acts taken that are not within the scope of her employment or that fall outside the grant of good faith immunity.

13. The Clinical Director of the Judges and Lawyers Assistance Program, Tim Sudrovech, is sued in his official capacity for the policies and procedures of JLAP and acts undertaken within

2

the scope of his employment and in his individual capacity for acts taken that are not within the scope of her employment or that fall outside the grant of good faith immunity.

14.     Dr. Elizabeth Bowman is sued for her alleged private torts, unconscionable contracting and alleged collusions with government actors, the latter being the conduit to alleged liability under 42 USC § 1983.

15.     Dr. Steven Ross is sued for his alleged private torts and alleged collusions with government actors, the latter being the conduit to alleged liability under 42 USC § 1983.

16.     The unnamed Defendants John Doe and Jane Roe are co-conspirators with the named Defendants whose actions, identities and relationship with governmental entities are not fully known at this time.

## INTRODUCTION OF CAUSES OF ACTION

17.     This litigation, at core, alleges a conspiracy to discriminate against Plaintiff in the Judges and Lawyers Assistance Program that culminated in the filing of fraudulent reports obtained through unconstitutional means with the Board of Law Examiners that influenced said governmental body to Plaintiff's detriment.

18.     The Indiana Supreme Court created JLAP. Admission and Discipline Rule 31, Section 2. The Board of Law Examines has authority to refer persons to JLAP "for assessment or treatment." Admission and Discipline Rule 31, Section 8(c).

19.     JLAP and the Board are distinct entities that do not share offices, mission statements, personnel or immunities.

20.     The currently named Defendants (other than the Chief Judge) are alleged to have been purposely and knowingly involved in acts taken under the color of law and through close affiliation with JLAP, along with other Doe Defendants (who may or may not be affiliated with JLAP) in which an end goal was commonly pursued because of, and not merely in spite of, its adverse effects upon Plaintiff's free speech, free exercise, due process and/or equal protection rights under the federal and state constitutions as well as general statutory and common law protections afforded Plaintiff.

21.     Plaintiff does not ask this Honorable Court to reverse or even review the ultimate outcome of his bid to become a licensed Indiana attorney. As precedent makes clear, that case will be heard, if at all, by the United States Supreme Court. This court simply lacks the subject

matter jurisdiction to relieve the instant Plaintiff of the order that he not be admitted to the Indiana bar and not even seek admission again until 2014.

22.     This suit is not focused upon the inaction of the Indiana Supreme Court or the action of the Indiana Board of Law Examiners. This suit is instead focused upon the actions of the staff of the Judges and Lawyers Assistance Program and the small cadre of hand-picked providers with whom they collaborate. As such this case has applicability far beyond bar admission issues.

23.     The actions alleged herein and the remedies sought herein are not the type that can be brought to the United States Supreme Court in an action seeking a reversal of the Indiana Supreme Court's denial of Plaintiff's admission to its bar. If the claims brought herein are not heard by this Honorable Court, the claims brought herein are unlikely to be heard in any court of law.

24.     Plaintiff had communicated his intent to bring this litigation long before the Indiana Supreme Court issued its five sentence, law-free ruling on his 31 month application to add Indiana to the list of multiple jurisdictions that had found him of sufficient moral character and mental fitness to practice law.

25.     Plaintiff had intended to bring this litigation whether Indiana found him possessed of such moral character and mental fitness or not. Thus the fact that Indiana did not should not enter into the calculus of whether this case is rightly before the court.

26.     What this Honorable Court is asked to consider in this litigation is whether JLAP, by charter, is involved in processing judges and attorneys through mental health assessments and treatments in difficult personal situations without due regard for the constitutional norms that define the American legal order.

27.     This suit brings to the bar the actions of some of the small cadre of hand-picked experts that JLAP assigns to work its cases. While JLAP may not be paying the monies directly to such mental health professionals, JLAP clearly mandates, as demonstrated *infra*, that such hand picked experts – and only such hand picked experts – will be the ones reviewing JLAP's "assignees." JLAP furthermore dictates the significant terms of the sessions they supervise through mandatory pre-briefings that go so far as to dictate what terms and findings are not to appear in final reports. (And, by extrapolation, what terms and finding are to appear in the final reports.)

28.     The allegations contained herein cut a window into a process that (thanks to public shame

4

and confidentiality rules) is seldom open to review by the public. Plaintiff brings this action for the good of his profession and all of those who will follow him into the JLAP system because Plaintiff: (1) has suffered much through the processing described herein; (2) believes, with Justice Louis D. Brandeis. that "Sunshine is the greatest disinfectant;" (3) is a twelve year licensed attorney fully dedicated the following: "As a public citizen  a lawyer should seek the improvement of the law, access to the legal system, the administration of justice and the quality of the service rendered by the legal system." Rules of Professional Conduct, Preamble; and finally, (4) perceive a duty to bring this litigation since he is under a "responsibility to assure that the regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar." *Id.*

## ALLEGATIONS OF FACT SUPPORTING LEGAL CLAIMS

29.    The Board of Law Examiners ("BLE") ordered Plaintiff to report to Tim Sudrovech of the Judges and Lawyers Assistance Program at the conclusion of Plaintiff's first hearing before the Board on January 25, 2008.

30.    That order effectively transferred the Plaintiff into the JLAP program, where he would remain until JLAP returned him back to the BLE with the January 22, 2009 filing of Tim Sudrovech's recommendations.

31.    Plaintiff was under a duty to be absolutely and totally candid in all matters, including all psychological or psychiatric examinations, pursuant to the laws governing bar admission. A finding that Plaintiff was less than honest, open and ruthlessly candid in this process could result in denial. Plaintiff was thus completely open, honest and candid in all matters detailed herein.

32.    Plaintiff placed a call to Tim Sudrovech immediately upon leaving the January 25, 2008 hearing and requested a meeting.

33.    About two months later Tim Sudrovech contacted Plaintiff and told him that he was to meet with Defendant Dr. Steven Ross, a Fort Wayne psychologist affiliated with JLAP, for an evaluation.

34.    Upon information and belief Dr. Ross was chosen for this assignment due to his specialization in religion.

35.    Upon information and belief Dr. Ross was subjected to pre-briefing on Plaintiff by Defendant Sudrovech and Defendant Does and possibly other Defendants named herein.

36. Plaintiff was given a battery of three psychological examinations by Ross in the two meetings at his Allen County office.

37. Plaintiff was troubled by the religious and political content of the questions on the psychological examination during his initial meeting at Dr. Ross' office and began taking notes of his concerns.

38. These notes constituted the work product of a licensed attorney of the State of Kansas who was representing himself at the time and contemplating this very court filing.

39. Dr. Ross did then order Plaintiff to surrender his work product and do nothing to preserve any of the test questions asked of him.

40. Plaintiff alleges that this seizure of his work product was done to obfuscate the religious and political nature of the questions asked of him on the alleged Minnesota Multiphasic Personality Inventory II ("MMPI-2") psychological examination.

41. Dr. Ross agreed to safeguard Plaintiff's work product.

42. Plaintiff met with Dr. Ross on numerous occasion after that initial seizure of the notes pursuant to Defendant JLAP's requirement.

43. Dr. Ross' issued a report dated April 23, 2008 in response to the testing and counseling sessions.

44. That report identified Plaintiff as a pro-life person with a traditional Christian worldview and constitutional, conservative political perspective who intended to advance the pro-life and Christian cause through the ArchAngel Institute.

45. In that April 23 report Dr. Ross concluded that Plaintiff "appears to have moral integrity."

46. In that April 23 report Dr. Ross concluded that he had found nothing that "should preclude Mr. Brown from taking the bar exam."

47. Defendant Sudrovech refused to accept this conclusion of the government's chosen and pre-briefed expert Defendant Dr. Ross.

48. That April 23 report also included the following statement that Defendant Tim Sudrovech employed to delay issuing a report from JLAP that was necessary to move Plaintiff's application to the Indiana bar: "[Mr. Brown's] emotional expressiveness and mood variability suggest to me the *possibility* of a sub-clinical bipolar disorder of a hypomanic type." (emphasis in original)

49. Upon information and belief "emotional expressiveness" refers to Plaintiff's religious and

6

pro-life communications.

50.    Upon information and belief this statement was inserted into Dr. Ross' report for prejudicial reason and with discriminatory intent.

51.    Plaintiff alleges that this statement was inserted into the Ross report for the very purpose of causing a remand to a psychiatrist.

52.    That April 23 report also included the following statement that Defendant Tim Sudrovech employed to delay issuing a report from JLAP that was necessary to move Plaintiff's application to the Indiana bar: "I am not making these statements purely based upon the *fervor of* Mr. Brown's *religious beliefs and convictions . . . . The fervor*, however, in which he represents himself vis a vis others and the intensity of his interpersonal style *suggests a sub-clinical level of a bipolar disorder* which would warrant further consideration by a psychiatrist."  (Emphasis added)

53.    Upon information and belief this focus upon Plaintiff's "emotion expressiveness" and "religious beliefs and convictions" is a product, at least in part, of the Minnesota Multiphasic Personality Index 2, a test administered to Plaintiff by Defendant Dr. Ross.

54.    Six weeks  after receipt of this report Defendant Sudrovech issued his own responsive report tendering the Ross report to the IBLE.  That report mandated that Plaintiff see a psychiatrist of the government's own choosing and pre-briefing.

55.    Plaintiff alleges that a conspiracy to deny his civil rights is evidenced by the Defendant Tim Sudrovech's reliance upon these statement to keep Plaintiff within the confines of the JLAP system while Sudrovech, at the same time, admitted in a report filed with the IBLE that "Mr. Brown does not meet the diagnostic criteria for the [bipolar] disorder."

56.    Thus Defendant Dr. Ross tendered to a state agent, upon the request of the state agent, after being assigned to the file by a state agent and after being pre-brief by a state agent a report weighing religious and political beliefs to conclude that it was Plaintiff's "fervor" and "emotional expressiveness" (which was, at least in part, religious)  that led to the "hypothetical" diagnosis of a mental illness that only a specialist in psychiatry could detect ("subclinical") and that results only in elation and not depression ("hypomania").

57.    This "bipolar" hypothesis caused Plaintiff no small amount of concern, given such "branding" can limit one's future as to insurance, employment and much else.

58.    Dr. Ross' report further detailed, in vague and uncertain terms the results of three

7

psychiatric tests that he had administered to Plaintiff.

59.     Dr. Ross' report implied that Plaintiff passed all three tests, but that his returns on the MMPI-2 (the exam he was taking when his work product was confiscated) were the least normative of the three.

60.     Plaintiff was concerned about the content and perceived errors in the Ross report and immediately contacted Defendant Sudrovech requesting a meeting to discuss the same.

61.     Defendant Sudrovech then refused to meet with Plaintiff for the second time and instead advised Plaintiff to take his concerns up directly with Dr. Ross pursuant to the following paragraph from the Ross report:" Should you [Mr. Tim Sudrovech] or Mr. Brown notice any errors in this report, please contact me.  I am open to a revised version of this report.  If either you or Mr. Brown have any specific questions, please do not hesitate to contact me."

62.     Plaintiff alleges that Defendant Sudrovech should have requested such a revision either before or after reading Plaintiff's concerns about alleged errors and discriminatory biases evident in the Ross report.

63.     Plaintiff wrote Dr. Ross two letters stating his concerns and requesting corrections, one dated June 12 and the second dated June 24, 2008.  Both of those letters were subsequently copied to Defendant Sudrovech.

64.     These letters raised several significant issues, including (1) the use of political and religious questions in psychiatric testing devices used by the State of Indiana suggesting that a political-religious orthodoxy exists (2) the use of religious questions and discussions as the gravamen of psychological analysis in the context of bar admission, (3) the "hypothetical" diagnosis that Defendant Sudrovech was using to hold up Plaintiff's application and (4) repeated requests for the return of Plaintiff's work product.

65.     In the June 12 letter Plaintiff requested a more objective and scientific reporting of the result of his testing, stating

It is my understanding that none of these three tests resulted in a pathological finding.  I request that the actual, objective results of these three exams be clearly reported in the opening section of your report.

66.     This request was not answered and no changes were made to the final report.

67.     As to the testing, in the letter dated June 12, 2008, Plaintiff wrote:

8

The imprecise and intrusive personal questions were bothersome to me, but the religious questions were even more disconcerting.    More than a few probed my views of the Divine, angels, sexual mores, sin and redemption. I have some understanding of the major doctrines of Christianity, and must report that most all were probed on the MMPI-2. I realized, as the test unfolded, that this was the anti-religious test that I had read about in orthodox Catholic literature.

68.    Plaintiff wrote Dr. Ross, on June 24, 2008, stating:

I believe that the April 23 report would be improved if you attempted to present the growing body of literature, or at least a passing reference to the same, calling the MMPI-2 into question as a test for those of a religious persuasion. I believe that the failure to disclose this common critique is an omission rising to the level of a testing-instrument error.

69.    None of the afore pled requests were answered and no changes were made to the final report.

70.    As to the testing, in a letter dated June 24, 2008, Plaintiff further wrote

It is my belief that my file contains objective evidence that was not communicated in your April 23 report, said objective evidence being, *inter alia*, a finding of near normalcy (except as to religious conviction and expression) on all three of the psychological tests I was ordered to undergo. Restated, I believe that my file, unlike your April 23 report, communicates that I pretty much "passed" the full psychological battery of more than 1300 questions put to me under the authority of the Indiana Supreme Court.

Please correct this assumption if it is in error, Dr. Ross.

71.    This request was not answered and no changes were made to the final report.

72.    Upon information and belief Plaintiff was subjected to a specialized form of the MMPI-2 that was specifically developed for use on Roman Catholic seminarians rather than the most common form of the MMPI-2.

73.    Plaintiff's allegation arises out of Dr. Ross' post-testing email to Plaintiff stating "please note that the MMPI is an instrument widely used by Catholic dioceses as part of the selection process for priesthood."

74.    Upon information and belief, Defendant Tim Sudrovech, as advised by other Defendants and/or Defendants Doe, chose Dr. Ross for this assignment and prepared Dr. Ross to meet with Plaintiff in pre-briefings. Upon information and belief Defendant Ross was chosen due to his expertise in interview with religious persons that is a byproduct of his status as a former Roman Catholic seminarian.

75.    In one of the meetings Dr. Ross commented that Plaintiff did not present nearly as troubled as he had been led to expect.

76.    Upon information and belief Defendant Tim Sudrovech and/or others, in preparing Dr. Ross, communicated to him certain expectations and intents that they held for the processing of Plaintiff through JLAP.

77.    Believing that the testing and interviews with Defendant Ross had been far more focused upon religion than necessary, Plaintiff notified Dr. Ross of the need to preserve the religious nature of the interview in Plaintiff's letter of June 12, 2008. This request was not answered and no changes were made to the final report.

78.    In the June 12, 2008 correspondence Plaintiff transcribed part of the interview in which Plaintiff was asked if he thought that he had enemies, and if, so, to identify his greatest enemy. When Plaintiff responded with the well known and commonly taught words of Martin Luther on the subject he was rebuked by Defendant Dr. Ross as stating something that simply should not be said. Plaintiff wrote to Dr. Ross: "You informed me that I was my worst enemy. (You did not say, "not Satan," but that certainly was the upshot of the message.)"

79.    As to the "hypothetical" diagnosis based upon religious "fervor" that Defendant Sudrovech was using to hold up the application, Plaintiff wrote: "I request that the "possible" "sub-clinical" diagnosis of a "hypomanic" kind be more precisely and scientifically set forth in your report, including references to test results raising this question." This request was not answered and no changes were made to the final report.

80.    In Plaintiff's second letter to Dr. Ross shared a large body of study noting that bipolar disorder was one of the most frequently over diagnosed conditions and was unlikely to show itself past mid-life. Plaintiff further requested that Dr. Ross "please also note in your report whether your analysis made use of the above referenced HCL-32 or any other standardized testing for bi-polarity, and please note that your analysis did not seek out any input from or about my family or friends." This request was not answered and no changes were made to the final report.

81.    Plaintiff was evaluated by Valeo Behavioral Health in Topeka six months prior to the Ross report. Valeo did not record any reason to suspect bipolar disease. Plaintiff was evaluated by Dr. Tom Sass, Dr. Bryan Flueckiger, Dr. William Alexy and Dr. Elizabeth Bowman in the months following the Ross evaluation. All of the aforementioned rejected the Ross hypothesis of

10

a bipolar condition. Defendant Bowman labeled it superficial and noted that at age 50 with no predicate past Plaintiff was an unlikely candidate for such a diagnosis.

82. Upon information and belief Plaintiff had been so diagnosed as an artifice to grant Defendant Sudrovech reason to remand Plaintiff to a state-chosen psychiatrist for further evaluation.

83. Plaintiff sought his hand written notes (work product) or copies thereof from Dr. Ross in his letters of June 12 and 24. Dr. Ross denied Plaintiff's reasonable request. Plaintiff sought these notes from Defendant Sudrovech to no avail.

84. Plaintiff sought assurances that his work product had not been destroyed and threatened court action to ensure that they were safeguarded. Defendant Ross then agreed to allow Plaintiff a few minutes to review his notes so that he could ascertain that they were being kept, but allowed no copies of the same to be made.

85. Plaintiff's review of these notes, over and against his ongoing study of the MMPI-2 and other psychological tests, raised yet more concerns on his part that the work product had been seized because it constituted evidence of a common plan to inquiry into areas of religion and politics that should not be the subject of state-ordered testing. Plaintiff transcribed these questions from memory after this review and sent them, with his constitutional concerns stated, to Defendant Sudrovech. Copies of that correspondence are attached hereto as Exhibit A.

86. Upon information and belief Plaintiff was denied this work product because it constitutes evidence of the wrongful use of an iteration of the MMPI-2 that is generally designed for identifying those of a conservative theological bent in religious ministry.

87. Plaintiff alleges that the State of Indiana, through JLAP, had no constitutional ground upon which to evaluate him against the backdrop of the MMPI-2, which is, upon information and belief, nothing more than a device build from public opinion surveys and then engineered to advance the social goals of the political correctness movement.

88. On June 24, 2008 Plaintiff wrote the IBLE Alleging "an inordinate focusing upon my religious views" during the interview with Dr. Ross and concerns about biases inherent in the "religiously-biased Minnesota Multistate Inventory 2"

89. Plaintiff received no response from the Board. The day that this report was received in the offices of the government Defendant Tim Sudrovech informed Plaintiff that the forward

11

progress of his application would be slowed if he did not drop the line of questioning put to Dr. Ross.

90.    Defendant Sudrovech wrote "I understand that it is YOUR choice, but I would be remiss if I did not warn you that by not pursuing a referral to a psychiatrist for further evaluation as recommended by Dr. Ross and JLAP, that you are delaying the Board of Law Examiners' ("BLE") ability to consider your application.  I would suggest that if you wish to continue to pursue your current direction with Dr. Ross, that you notify Linda Loepker at the BLE that you are doing so."

91.    On July 30, 2008 Plaintiff again wrote Defendant Sudrovech.  Plaintiff accepted Sudrovech's June 4 offer of a mentor for JLAP program.  Plaintiff also requested, for the third time, a meeting with JLAP.   Defendant Sudrovech did not response to Plaintiff's acceptance of an offered mentor, request for a meeting or explanation of Plaintiff's concerns.

92.    Having exhausted all avenues toward the improvement of Dr. Ross' report, Plaintiff wrote Defendants Sudrovech, Harrell and BLE Executive Director on September 8, 2008 explaining in detail his reasons for fearing that the process being employed against him was improperly considering his religious and political beliefs.

93.    Plaintiff requested an independent review of his case by state officers trained in constitutional and civil rights laws and requested a meeting with JLAP officials for the fourth time.  Plaintiff received no response to the letter and no responses to his multiple requests for an independent investigation of his allegations of the violation of his civil and constitutional rights.

94.    Plaintiff alleges that the entire process before Dr. Ross as set forth in the preceding paragraphs evince an effort to force Plaintiff to accept a state defined orthodoxy antithetical to his religious and political beliefs.  Plaintiff alleges that this attempt to force him to accept a state defined orthodoxy was the work of many persons, both governmental and private, working toward the same unlawful goal while motivated by bias, invidious discriminatory intent and animus.

95.    In his April 23 report Dr. Ross recommended  that Plaintiff see a psychiatrist based upon his hypothetical diagnosis of "hypomanic bipolar disorder"  and mentioned one in particular by name, that one being identified as a close associate of Dr. Ross.  That psychiatrist will herein be identified as Dr. F.

96.    Plaintiff raised conscience objections to secular psychiatry in general, believing it to be antithetical to his Catholic faith and conservative, constitutional perspective on many levels.

97.    Plaintiff also argued that the State lacked a predicate to so violate his religiously informed conscience, since the remand to a psychiatrist was merely predicated upon Defendant Dr. Ross' concerns that Plaintiff's religious *"fervor ... suggests a sub-clinical level of a bipolar disorder* which would warrant further consideration by a psychiatrist."

98.    Plaintiff also argued that the State lacked a predicate to so violate his religiously informed conscience, since Defendant Sudrovech had admitted in his report that "Mr. Brown does not meet the diagnostic criteria for the [bipolar] disorder." These objections were ignored by Defendant Sudrovech.

99.    Given all that had transpired, Plaintiff requested of Defendant Sudrovech a second opinion from a psychiatrist not closely affiliated with Dr. Ross. This request was denied.

100.    Plaintiff then explained, in greater detail, his concerns and reservations about the process to date and again requested a second opinion outside the affiliation of Dr. Ross.

101.    On September 9, 2008, Plaintiff asked permission to see a Fort Wayne psychiatrist of his own choosing rather than one of Dr. Ross's choosing. Defendant Sudrovech replied that "JLAP would be the one to provide the psychiatric referral" and that in this case JLAP was trusting the referral of Defendant Dr. Ross.

102.    Defendant Sudrovech further explained this policy as follows: "JLAP only uses referral sources who we are familiar with, or come highly recommended." Defendant Sudrovech then wrote that the policy of JLAP is as follows: any psychiatrist that the State will use must be chosen by JLAP from JLAP's list of acceptable providers and then first be briefed by a JLAP agent, and then briefed by the previous counselor, and only then is an applicant allowed to see the referred provider."

103.    Upon information and belief that list of approved providers is determined based upon personal relationship and/or ideological conformity with Defendants Sudrovech, Harrell, Bowman or unnamed co-conspirators.

104.    Defendant Sudrovech stated that no matter who JLAP referred, the process would be as follows: "JLAP will need to speak to the provider first. ... with any referral that JLAP makes, we speak to the provider first. That way they are aware of the history behind the referral and are not seeing the client 'blind' for the first session."

13

105.    Plaintiff interpreted this system one that would "front-load" discriminatory biases, recalling that Dr. Ross had commented that Plaintiff had not seemed as troubled as the pre-briefing had suggested.

106.    Plaintiff, realizing that his constitutional concerns and repeated requests for an independent review of his case were being ignored, thus asked to be allowed to meet with a psychiatrist before such a briefing to develop his own expert. Dr. F was then proclaimed the only viable alternative and Plaintiff was told to make an appointment with him or risk dismissal of his application for bar admission.

107.    On September 16, 2009, after repeatedly seeking leave to be evaluated by a psychiatrist not affiliated with Dr. Ross or JLAP, Plaintiff self-presented to St. Joseph's Medical Group Psychiatric Care unit, Dr. Bryan Flueckiger, for an evaluation. Dr. Flueckiger was familiar with such evaluations as the Indiana authorities sought and stated that the psychiatric profession considered a one hour session sufficient time to make an evaluation such as that recommended under Rule 12.

108.    Dr. Flueckiger had read through the Ross report, reviewed the testing data from Dr. Ross and reviewed Rule 12, among other sources, before meeting with Plaintiff. After the one hour evaluation Dr. Flueckiger stated that he could recommend Plaintiff as an Indiana attorney pursuant to Rule 12.

109.    Defendant Sudrovech again informed Plaintiff that he had to be evaluated by Dr. F or suffer the potential dismissal of his application for failure to follow JLAP's instructions. Plaintiff then lodged his conscience clause objections to the process with Defendant Harrell and made an appointment for an evaluation for the purpose of joining the Indiana bar with Dr. F as directed by JLAP.

110.    Terry Harrell then agreed to pre-brief Dr. F personally, as that Tim Sudrovech was out of the office. Upon information and belief Defendant Terry Harrell did so brief Dr. F.

111.    When Plaintiff showed up for the appointment Dr. F's nurse informed Plaintiff that Dr. F did not perform evaluations of the kind that JLAP sought. This was surprising since Plaintiff had clearly disclosed to the person who set up the appointment with Dr. F that the appointment was for an evaluation pursuant to Rule 12 for admission to the Indiana bar.

112.    Upon information and belief Dr. F came to the conclusion to cancel the appointment after being briefed by either Defendant Terry Harrell or Defendant Dr. Ross. Upon information and

14

belief Dr. F decided to not perform the evaluation after consideration of the nature of the pre-briefing given to him and/or the result that was asked of him.

113. Dr. F, the expert previously recommend by JLAP then recommended, in writing, that Plaintiff be evaluated by either of two local psychiatrists. One was Dr. Bryan Flueckiger.

114. Plaintiff tendered this recommendation to Defendants Sudrovech and Harrell and asked to be sent to one of these psychiatrists who were recommended by the very expert that these Defendants had been mandating for months. These experts were both dismissed as a nonviable alternatives to Dr. F by JLAP for reasons not explained.

115. Plaintiff immediately offered to drive 1500 miles round trip to Valeo Behavior in Topeka, Kansas for the needed psychiatric evaluation. Plaintiff presented this as an objective path toward psychiatric review that had already established a baseline for him and that was independent of both Dr. Ross and Defendants. Defendant Terry Harrell refused this request.

116. Defendant Harrell then ordered Plaintiff to choose one of two psychiatrists in Indianapolis, both of whom were associated with Indiana University's School of Psychiatry, and none other. Plaintiff was informed that he had a very limited time in which to complete these psychiatric exams or suffer dismissal of his application.

117. On October 3, 2008 Plaintiff once again requested permission to see the Fort Wayne-based Board certified psychiatrist Dr. Flueckiger, who was actually recommended by both Dr. F and Dr. Steve Ross, two experts otherwise trusted by JLAP. Plaintiff communicated at that time that he was not seeking to see Dr. Flueckiger in lieu of JLAP's designated psychiatrist, but only as his own in order to develop his own case.

118. Plaintiff asked that Dr. Flueckiger be briefed in the same manner as was Dr. Ross and Dr. F. Defendant Sudrovech refused to brief Dr. Flueckiger.

119. Plaintiff then escalated his request for a briefing, asking Defendant Terry Harrell to ensure that Tim Sudrovech had Dr. Flueckiger briefed just as Dr. F was briefed so that he could be an expert witness for Plaintiff. Defendant Sudrovech then emailed notice that Dr. Flueckiger could be so briefed as an expert if a release was signed. It was

120. While attempting to persuade the government Defendants to brief Dr. Flueckiger so that he could be useful as an expert witness, Plaintiff sent email to the Defendants Sudrovech and Harrell communicating his concerns about the process and asking that any subsequent actions by

15

JLAP be "just, true and untainted by political and/or anti-religious concerns" and again requesting an investigation of his allegation of civil rights violations.

121. On October 13, 2008 Plaintiff once again voluntarily reported to Dr. Bryan Flueckiger of St. Joseph's Medical Group Psychiatric Care unit for a second hour of evaluation. Upon his arrival at Dr. Flueckiger's office Plaintiff learned that Defendant Sudrovech had not briefed Dr. Flueckiger as was repeatedly requested by applicant and was allegedly ordered by Defendant Harrell.

122. Dr. Flueckiger found Plaintiff to pass review under a Rule 12 analysis and subsequent to this meeting produced a report stating the same. (Report attached as Exhibit B) Upon information and belief Defendants Sudrovech and Harrell pre-brief only those experts from whom they wish to receive reports, and then considering only the reports of those experts whom they have pre-briefed.

123. In October, 2008, Plaintiff again requested a meeting with Defendants Sudrovech and Defendant Harrell. Plaintiff was told that there would be no such meeting, and no final report, until and unless he subjected himself to a psychiatrist of JLAP's own choosing.

124. Defendant Harrell's designated, two Indianapolis-based, government-affiliated psychiatrists instructing Plaintiff to choose one of them. Plaintiff did so while clearly communicating that he was doing so under protest and while raising a religious and legal conscience-based objections to the process being used, citing both the Indiana and Federal constitutions while so doing.

125. Plaintiff did so, in part, to gain a meeting with JLAP's Tim Sudrovech and Terry Harrell.

126. Defendant Terry Harrell responded that she was recommending Dr. Elizabeth Bowman and one other because they were providers "that we know and recommend." Defendant Harrell's notice of Bowman's contact information did not reveal that her practices was dubbed "Choices" or that she was a dedicated and long time feminist activist.

127. Upon information and belief Defendant Harrell knew this fact and realized that Plaintiff, as a pro-life Roman Catholic, would find it significant in his decision as to which of the two government-affiliated psychiatrists to see.

128. Plaintiff was past a deadline due to the Defendants' error as to the availability of Dr. F and so immediately placed calls to both of the State-designated experts. Dr. Elizabeth Bowman promptly returned the call and stated that she could see Plaintiff almost immediately.

16

129.   Upon information and belief Dr. Elizabeth Bowman knew of Plaintiff's identity as a pro-life Christian before he contacted her on that day.

130.   Defendant Tim Sudrovech notified Plaintiff that both he and Dr. Ross would brief Dr. Bowman regarding Plaintiff almost immediately after receipt of Plaintiff's releases authorizing such contact with Defendant Dr. Bowman

131.   Dr. Bowman immediately rejected Plaintiff's advice, based upon Dr. Flueckiger's professional opinion, that such evaluations should take only an hour and ordered Plaintiff into two sessions within four days, one being a double session. Two more sessions followed after those.

132.   All of these sessions took place in a borrowed office of another psychiatrist. Upon information and belief such an office was used because Defendant Bowman's own office was identified by the moniker "Choices" and is appointed with memorabilia that would have revealed her deep seated prejudices against Plaintiff's Roman Catholic faith and conservative political opinion.

133.   In these encounters Dr. Bowman focused upon Plaintiff's religious and political beliefs and associations to the exclusion of almost any other topic.

134.   Doctor Bowman underreported the time spent in session in her final report and misreported the number of times that Plaintiff met with her. This error in the reporting of number of sessions and hours in session ended up in the final report of the BLE.

135.   Due to the time constraints Plaintiff was unable to undertake much of an investigation of Dr. Bowman's body of work prior to his sessions with her, but had located one academic journal in which she had warned of the potential psychiatric harms that accompanied exorcism undertaken by clinicians as a form of psychiatric treatment.

136.   At the beginning of their first session Plaintiff asked Dr. Bowman about her views on such matters, noting that she had written a letter to an academic journal stating that clergy should be subjected to discipline if they performed exorcisms on persons presenting with multiple personality disorder.

137.   Dr. Bowman then abruptly informed Plaintiff that she would be doing the asking and that he would doing the answering in their sessions together and that her background and ideas were not at issue and irrelevant to the task at hand.

17

138.    After four sessions that lasted an estimated six or more hours in duration Defendant Bowman authored a report that concluded, unlike any of the previous professional counselors, that Plaintiff suffered from a personality disorder.

139.    Like Defendant Dr. Ross with his "possible" hypomania, Dr. Bowman was not able to fully define this malady stalking the Plaintiff, and thus tagged Plaintiff with the vague label "Personality Disorder, Not Otherwise Specified."

140.    Upon information and belief this label is given, in the main, due to Plaintiff's open and uncompromised adherence to the Roman Catholic Magisterium, as her report reveals: "His conscience has been shaped by his Roman Catholic beliefs, to which he came in adulthood while seeking moral certainty."

141.    Dr. Bowman's first substantive question of Plaintiff was whether the ArchAngel Institute was inclusive of all religions or only Plaintiff's faith expression. Plaintiff assertion that it was built upon the revelation given only to Christocentric expressions of faith was met with perceived disdain.

142.    Dr. Bowman's report accused Plaintiff of religious arrogance for such insolence in her final report, finding that arrogance basis for an allegation of narcissism that then supported her ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

143.    Dr. Bowman asked Plaintiff what problems he had with Dr. Ross. Plaintiff explained his belief that the test questions and seizure of work product violated his constitutional rights and noted that case law circumscribed the proper focus of government evaluations.

144.    Dr. Bowman then ordered Plaintiff to quote no more cases to her and notified Plaintiff that she could ask any question and probe any area that she thought germane, regardless constitutional barriers regarding religion or politics.

145.    Her report further charged Plaintiff with speaking ill of Dr. Ross, liberals and psychotherapy and "showing off" by quoting cases to her, finding in that the basis for an allegation of narcissism that then supported her ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

146.    Plaintiff was asked to explain why he had resisted an evaluation from Dr. F. Plaintiff explained that he sought an evaluation independent of Dr. Ross's influence. Defendant Dr. Bowman then revealed that Dr. F had been her student and she was his mentor.   Upon

18

information and belief such could probably be said of most all of the small cadre of JLAP approved providers.

147.    After ordering Plaintiff to recount his family history in detail Dr. Bowman announced that his pro-life zeal was a byproduct of his emotional response to the premature birth of his younger twin brothers, stating "They must have looked like skinned rat terriers, and having been put in the position of caregiver for them in your early adolescence later caused you to identify with fetuses in the pro-life movement."

148.    Plaintiff disagreed with Dr. Bowman's analysis, countering that he was pro-life due to the fact that Mary, soon after the Holy Spirit overcame her, visited Elizabeth, who announced that John the Baptist leapt in her womb.  Plaintiff informed Dr. Bowman that this event caused him to conclude that John had personality late in the second trimester and that Jesus was in Mary's womb as a distinct person at conception.

149.    Dr. Bowman then challenged Plaintiff to realize and appreciate that others interpreted that scripture quite differently, holding that Elizabeth merely read too much into a flutter in her abdomen.  Plaintiff informed the state-mandated psychiatrist that he was Roman Catholic and that his Church instructed him in the proper interpretation of that scripture and that the pro-life ramifications of it were his "truth," regardless of how others interpreted it.

150.    Dr. Bowman recorded in her final report that Plaintiff had offended her and devalued  her faith with such responses, rendering it basis for an allegation of narcissism and that then supported her ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

151.    Upon information and belief the above is evidence that Defendant Bowman was unable to detach her own personal biases and invidious discriminatory intent from per professional duties to the state.  Plaintiff alleges that once this was discovered all Defendants had a duty to recall the Bowman report, and that the failure to do just that is evidence of malice, bias and invidious discriminatory intent.

152.    Dr. Bowman informed Plaintiff that he had caused much trouble in Fort Wayne in the late 80's and early 90's and that he should not think that it would have just been forgotten.  Upon information and belief Dr. Bowman and/or other Defendants, including Defendant Does, had firsthand knowledge of Plaintiff's pro-life volunteer in Fort Wayne in that time period.

19

153.   Dr. Bowman informed Plaintiff that he placed his values and morals higher than legal obligations and by so doing shared much in common with early church, including being at odds with the state.  That Plaintiff's conservative political and Roman Catholic views were the primary focus of Dr. Bowman's interviews are evident throughout Dr. Bowman's final report and are used to support her conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

154.   Dr. Bowman's report stated that:

"Like many people of faith of past millennia, he firmly believes he is obligated as a Christian to put obedience to God's laws above human laws." Id.; "He considers his [former protest activities] an integral part of his Roman Catholic Christian faith and considers his actions morally right." Bowman report at p.4;

155.   Upon information and belief this report influenced the final Board of Law Examiner's final report stating that:

"He testified [as] to his obligation to disobey laws that contradicted his religious beliefs under certain circumstances. [He further] indicated that he would not obey certain court orders and judgments that he believed to be unjust. [It is the policy of the Indiana court] that a member of the Indiana bar must obey Indiana law and federal law, even when doing so violates an attorney's conscience, and that an avowed willingness not to do so is disqualifying." Board report at pp.29-30.

156.   Dr. Bowman distilled the following from Plaintiff's religious and political perspectives after inquiring into the work of the ArchAngel Institute and Plaintiff:

 "He bragged about ArchAngel Institute and devalued the abortion providers whose clinic site he took over for this institute."

157.   Thus Plaintiff's recounting of his work in redeeming a dilapidated abortion clinic was counted as evidence that he was narcissistic, and that then supported her conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

158.   Defendant Bowman also weighed Plaintiff's religious perspective to state: "He showed lack of empathy for women whose pregnancies may be the result of rape or incest." Plaintiff has no recollection of discussing such exceptions in session, but such exceptions are indeed discussed in most pro-life literature and in the Catechism of the Catholic Church. Thus Plaintiff's adherence to Catholic doctrine was counted as evidence of narcissism and that then

supported her ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

159.    Defendant Bowman also weighed Plaintiff's religious perspective to state "He showed lack of empathy for … the plaintiffs against him in the federal suit who were left with their attorneys fees to pay." Thus Plaintiff's lack of good will toward those who benefit financially from the volitional termination of nascent human life and who sued him out of economic existence under legal theories later scuttled by the Supreme Court was counted as evidence of narcissism and that then supported Bowman's conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

160.    Defendant Bowman demonstrated a lack of toleration of Plaintiff's religious opinions by reporting that: "He showed lack of empathy for … this evaluator whose profession and presumed religious beliefs he repeatedly devalued." Thus Plaintiff's sincere and unvarnished explanation of his Catholic faith was used as evidence that he was narcissistic and that then supported Bowman's conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

161.    Defendant Bowman, who was asking all of the questions by her demand, complained that Plaintiff "regularly returned to the topic of abortion and his views on it," This religious and political "hot potato" was thus marshaled as evidence that Plaintiff was obsessive compulsive and that then supported Bowman's ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

162.    Still focused on Plaintiff's thoughts, Defendant Bowman concluded that "Mr. Brown's thinking showed obsessions with viewing mental heath assessments as subjective, biased against religion, and negatively inclined toward him." Thus Plaintiff's prescience and insight (in fact her final report was focused upon thoughts and beliefs, was biased against his religion and was negatively inclined toward him) was marshaled as proof that Plaintiff was obsessive compulsive and that then supported Bowman's ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

163.    The doctor charged that Plaintiff "expressed *devaluing* attitudes toward pharmacologic or psychotherapeutic mental health treatment" and made "sarcastic remarks *devaluing* authority of all types, especially mental health authority and the abortion industry." (emp added) Thus Plaintiff's low view of psychiatry and abortion was marshaled as evidence that he was arrogant

21

and thus narcissistic and that then supported Bowman's ultimate conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.

164. As to Plaintiff's future, Dr. Bowman mined his religious and political perspectives to issue the following warning in her final report: Since "Mr. Brown has spent most of his legal career and personal life involved in litigation related to religious rights and on opposing abortion "I believe he would be likely to use admission to the bar of any state to continue to work for religious rights..." "If admitted to the Indiana bar he would likely continue his anti-abortion activities..." Thus Plaintiff was weighed in the balances and found very much wanting by the Defendants because he was constitutional law attorney dedicated to use his experience to advance his religion and protection of nascent human life.

165. While Dr. Bowman's report does include some positive statements about Plaintiff, her report does not contain a conclusory statement that parallels Dr. Ross' conclusion "that he could not identify a reason to preclude the Applicant from sitting for the July 2008 examination" Board order, Para. 41.

166. Defendant Bowman told Plaintiff that during the pro-briefing Defendant Sudrovech had instructed her to not record a final conclusion as to Plaintiff's ability to pass Rule 12 analysis as both Dr. Ross and Dr. Flueckiger had done. Defendant Sudrovech rather ordered Defendant Bowman to leave the question open to be addressed by his final report.

167. Plaintiff had retained Dr. Bowman to receive just such a conclusion from her, just as he had from Dr. Ross and Dr. Flueckiger. Had Plaintiff known of Defendant Sudrovech's directive otherwise he would not have retained Dr. Bowman, just as he would not have retained her had he known of her associations, published materials and focus of her practice.

168. The final section of her report, entitled "the Evaluator's conclusion" states, *inter alia,* that "I find him not psychotic, not depressed at this time, not having bipolar disorder, and to have moral integrity." The report does not, however, state that Plaintiff passes muster under Rule 12 analysis.

169. Every other mental health practitioner who evaluated Plaintiff came to the same conclusion -- Dr. Ross merely hedged his bet on the bipolar issue for reasons not completely evident at this time but alleged to be the product of collusion between the Defendants.

170. Based upon the reasons set forth above, Plaintiff alleges that Defendant Dr. Bowman diagnosed Plaintiff with "Personality Disorder, Not Otherwise Specified" based upon his Roman

22

Catholic, pro-life, pro-family and constitution-respecting conservative perspectives on religion and politics.

171. Plaintiff took issue with this conclusion affecting "fitness," which had been reached by none of the more than six other mental health professionals who had evaluated him in the preceding year, filing a lengthy statement with the government authorities allegedly supervising this process seeking a redress on the errors, reliance on religion and reliance on politics in the Bowman report.

172. Plaintiff's concerns were ignored, JLAP accredited the report when tendering it to the Board and the Board used much of the Bowman report is its final report dated, but not signed, on September 25, 2009.

173. As part of her evaluation Dr. Bowman required Plaintiff to present to psychologist Dr. William Alexy, who subjected Plaintiff to three additional psychological examinations during a more than three hour interview.

174. Dr. Alexy issued a final report on Plaintiff that concluded, in part,

"his feelings and emotions are normatively controlled and well-modulated …. P.4, L.2, "his reality testing is within normative expectations," P.4, L8, "He generally interprets the world in a way that is consistent with good reality testing. There is also the suggestion that when the world sends him high information/low ambiguity data he can generally be expected to behave according to social convention." Id. "His thinking processes are logical, coherent, sequential and pertinent." P.4. "He takes very seriously and importantly the role that he plays as husband and father to his family." P4. And "there is no suggestion of a significant thinking disturbance" P.4, L.14, and "I do not see any compelling evidence of Bipolar Disorder" P.5, L.4 and "I certainly can see Bryan functioning adequate as a practicing attorney" Report of Dr. Alexy, Nov. 30, 2008

175. Dr. Bowman asserted in her final report that Dr. Alexy "felt Mr. Brown would benefit from individual psychotherapy with a woman therapist." This statement is nowhere found in Dr. Alexy's report.

176. Plaintiff spoke with Dr. Alexy by telephone at 4:30 pm on May 12, at which time Dr. Alexy denied making such a recommendation. Dr. Alexy then informed Plaintiff that he did not agree that Plaintiff needed to be referred to any professional based upon that counselor's gender.

177. Upon information and belief the statement that Dr. Alexy "felt Mr. Brown would benefit from individual psychotherapy with a woman therapist" in the Bowman report is fraudulent as well as evidence of animus and invidious discriminatory intent

23

178. Dr. Bowman asserts in her final report that "Dr. Alexy's testing concluded that Mr. Brown likely has Personality Disorder Not Otherwise Specified." This statement is nowhere found in Dr. Alexy's report. Dr. Alexy instead offers no diagnosis as to a mental illness or "personality disorder" in his report. Dr. Alexy, like Dr. Flueckiger, found no label from the DSM IV applicable to Plaintiff.

179. Plaintiff reported the above inaccuracies in the Bowman report to government authorities allegedly supervising this process.

180. No curative action was taken, suggesting that fraud is welcome in this instance due to the bias, animus and invidious discriminatory intent marshaled against Plaintiff in response to his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

181. After receipt of Defendant Bowman's inflammatory and discriminatory report Plaintiff began investigating Dr. Bowman's associations and publications.

182. Plaintiff located very little in the professional and peer reviewed journals authored by Dr. Bowman but discovered that Defendant Bowman has received professional awards for her work on religious syncretism in which religion is reconciled with modern psychiatry.

183. Plaintiff then discovered that Dr. Bowman was a Protestant cleric of a decidedly liberal persuasion (Master of Sacred Theology from the United Church of Christ affiliated Christian Theological Seminary) who claims "extensive experience teaching and writing on spirituality" who is "actively involved in a mainline Protestant congregation" and who has been an Evangelical and Women's Caucus member for "so long that she cannot remember when she joined".

184. The Evangelical and Women's Caucus was founded in 1973 to advance feminism, pro-choice ideology, women clergy and an end to the patriarchy. Dr. Bowman travels the country putting on seminars for such feminist groups, including a seminar that allegedly identifies an "unhealthy religious system" that conditions its adherents to respond with "offensive spirituality and spiritual defenses." Such offensive and unhealthy spirituality is found, according to Elizabeth Bowman, in the exclusive use of "male images of God" and the "patriarchy as a form of idolatry."

185. Upon information and belief Dr. Bowman has so presented in session alongside members of the Fort Wayne Feminists. Upon information and belief Dr. Bowman is now and has long

24

been associated with leaders in the Fort Wayne Feminists. Fort Wayne Feminists were adverse to Plaintiff in federal litigation regarding abortion access that was filed in Fort Wayne in 1990 and that was referenced throughout Dr. Bowman's sessions with Plaintiff and in her final report. The leaders of the Fort Wayne Feminists are well acquainted with Plaintiff's pro-life activities in Fort Wayne in the late 1980's and early 1990's.

186.    Plaintiff also discovered that Dr. Bowman appeared in a made for television docudrama entitled "In the Grip of Evil" in which she attempts to debunk Catholic exorcism and alleges that priests fabricated accounts of one of the most studied of all modern exorcisms.

187.    Dr. Bowman's writings communicate religious intolerance against those of Plaintiff's traditional Catholic and Evangelical bent, including the following :

"To her credit, Dr. Mollenkott takes on "*Christian Doublespeak*" and confronts the logical *contradictions* of scriptural interpretation offered by the *religious right* in trying to *crush* homosexual and other transgendered people. These sections of her book in which she argues *scriptural interpretations and theology* are the *most powerful* portions." (http://www.eewc.com/Reviews/Spring2001Omnigender.htm (emphasis added.)

188.    Plaintiff also located the following seemingly malicious writings of Dr. Bowman:

"In her final chapter, Dr. Mollenkott quotes Martine Rothblatt's description of a society that encourages *freedom of gender*. My response to such a society is '*sign me up*!" To me, this *gender-free society* would be a safer, more just, and more happy place *for women*. It would be nirvana; *heaven on earth*. In it, the salary discrimination I suffered at Indiana University and the *religious sexual discrimination* of my childhood would be unknown. *Jesus* would be comfortable in such a society but *conservative religion, the church included*, would either be *non-existent* or would be *horrified beyond words*."    (Emphasis added)

189.    All of this was brought to the attention of the Defendants Sudrovech and Harrell, as well as all other government agents involved in the review of Plaintiffs application, No action was taken to redress the harm arising from these seeming biases. Upon information and belief the refusal to remedy the effect of such prejudices and intolerances is evidence of animus and invidious, discriminatory intent raised against Plaintiff due to his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

190.    Upon information and belief, evidence of animus and invidious discriminatory intent is found in the very dating of Dr. Bowman's report, especially in light of Plaintiff's disagreement

25

with her on discussion of the nascent life of the Savior. Defendant Dr. Bowman's report was dated December 24, 2008.

191.    Upon information and belief, evidence of animus and invidious discriminatory intent was shown when Defendant Bowman sent her report to Plaintiff's house with a personal note to Plaintiff's wife attached to the report.

192.    In her report Dr. Bowman had opined that Plaintiff "appeared unaware that he is now exploiting his wife and children by asking them to live with the unfortunate financial consequences of his unemployment while he serves his passion for anti-abortion activities in an unpaid position while his wife home schools three children." Dr. Bowman used this "exploitation" arising out of "pro-life passion" as evidence of Plaintiff's alleged narcissism and thus evidence leading to the diagnosis of "Personality Disorder, NOS."

193.    On or about December 30, a package arrived in the mail from Dr. Bowman. Upon opening it Plaintiff's wife discovered a personal, handwritten note that read as follows: "John [sic] and Anne, Congratulations on the safe delivery of Judah Christopher! May he flourish and may you recover quickly, Anne. That was a big baby! Elizabeth Bowman."

194.    Plaintiff was not home at the time and Plaintiff's wife did then read the Bowman note, which caused concern. Anne had given birth to a son who was a large baby named Judah Christopher only two days before this note was sent to their home attached to a confidential medical report. Upon information and belief this note to her patient's wife reveals evidence of animus and invidious discriminatory intent.

195.    Upon information and belief Defendant Tim Sudrovech received the Bowman report, a report that he and/or Defendant Harrell had "front-loaded" through pre-evaluation discussions with Dr. Bowman, joined by Dr. Ross, at about the same time as Plaintiff's wife. Upon information and belief Defendant Tim Sudrovech did not compare the Bowman report to the Alexy report. Defendant Tim Sudrovech did not in any fashion critique or correct the blatant reliance upon religion and political opinions found on the face of the Bowman report. Defendant Tim Sudrovech instead build upon the Bowman report, which did not, as he had requested, opine that Plaintiff could or should sit for the bar exam.

196.    Once again, Defendant Sudrovech noted that Plaintiff "did not meet the diagnostic criteria for any specific disorder" much as he did when tendering the Ross report. However, since Plaintiff's political and religious views had proven so troublesome to Dr. Bowman,

Defendant Sudrovech was able to report to the Board that "Mr. Brown's diagnosis is Personality Disorder, NOS."

197. Defendant Sudrovech noted that Dr. Bowman's report was *based,* in large part, upon Plaintiff's "lack of empathy" regarding "issues associated with *his beliefs*." Defendant Sudrovech did not point out to the Board that those beliefs were at the core of the First Amendment's zone of protection.

198. Defendant Sudrovech noted that Defendant Bowman credited Plaintiff's "personality disorder" as *the source* of his "civil disobedience." Defendant Sudrovech failed to quote the sections of the Bowman report that stated that Plaintiff "clearly has moral integrity, which has consumed his life and *led,* at times, to principled civil disobedience." and "He has moral integrity [which has been] expressed in a manner that has *led* to principled civil disobedience *based on* his religious beliefs."

199. Simple logic thus reveals that the Bowman report equates Plaintiff's religious beliefs with Plaintiff's "personality disorder." Defendant Sudrovech's report obfuscated, rather than revealed, this simple logic.

200. Defendant Sudrovech, MA, LCSW, then took upon himself the role of diagnostician, writing that "JLAP agrees to some degree with Dr. Bowman's conclusion 'that Mr. Brown's success would be enhanced by individual psychotherapy,' as anyone who would actively involve themselves in a therapeutic process would." Going deeper into the practice of the psychiatric arts, Defendant Sudrovech then opined, "However JLAP questions how much Mr. Brown would value the experience of psychotherapy, how appropriately engaged in a therapeutic process he would be." (Emp. in original)

201. Defendant Sudrovech held the Bowman report on his desk for approximately three weeks, causing it to be filed, and stamped by the BLE, on January 22, 2009, on the thirty-sixth anniversary of the Roe v. Wade decision. Plaintiff alleges that evidence of animus and invidious discriminatory intent is once again found in the dating of Dr. Bowman's report.

202. The Board's final report, which Plaintiff alleges to have been written, in large part, by one of the instant Defendants, quoted many pages of the January 22-filed and December 24-authored Bowman report. The Board's final report employed the Bowman report, in large part, to recommend that Plaintiff be denied admission based upon both moral character and mental

27

fitness. Plaintiff repeatedly moved the government to recall the Bowman report for these glaring and obvious religious and political biases – without success.

203. The Board's final report employed the Sudrovech report, in large part, to recommend that Plaintiff be denied conditional admission based upon Defendant Sudrovech's interpretation of Plaintiff's likely response to the conclusion that he "would benefit from individual psychotherapy with a woman therapist."

204. On May 7, 2009, Linda Loepker issued, as Executive Director of the Board of Law Examiners, a subpoena mandating JLAP to produce "the entire contents of the file of Bryan J. Brown held by the Judges and Lawyers Assistance Program." Upon information and belief these files hold evidence of bias, animus and invidious discriminatory intent as well as a copy of the work product seized by Dr. Ross. Upon information and belief these files hold evidence of collusion between the Defendants named herein and, possibly, Defendants Doe.

205. Defendant JLAP, by and through Defendant Harrell refused to tender at least one file covered under subpoena. Defendant JLAP refused to describe that file or otherwise submit a privilege log. Plaintiff requested the Board to take steps to enforce its subpoena. No action was taken.

206. Soon after Dr. Ross and Tim Sudrovech briefed Dr. Bowman, Plaintiff received a bill from Dr. Ross that claimed to be more than four months overdue. Plaintiff paid the $175 under protest.

207. Defendants Dr. Bowman and Dr. Ross were vested with governmental authority through their willing collusion and close working relationship with Defendants Sudrovech and/or Harrell.

208. On September 15, 2009 the Indiana Supreme Court, through Chief Justice Randall Shepard, Justices Boehm and Sullivan, and against the dissent of Justices Rucker and Dickson, did amend the rules governing civil liability for those involved in the processing of applications to the Indiana bar, extending to all who in any fashion investigate or process bar applicants total and absolute immunity as of January 1, 2010.

209. The grant of immunity is widened to include not only written statements but also oral statements received against a bar candidate, thus setting up a "secret police" like state organ in the office of the Board of Law Examiners. Order Amending Indiana Rules for Admission to the Bar and the Discipline of Attorneys Rule 23§ 20

28

210. Upon information and belief this change in Indiana law portends a future intent to process applicants as Plaintiff was processed at bar.

211. On September 15, 2009 the Indiana Supreme Court did amend the rules governing the reporting of Law Examiner investigations and investigative outcomes as of January 1, 2010.

212. The grant of communicating the Bar Examiner's well hidden work is expanded to allow the Bar Examiners to deliver, to a "national bank operated by or on the behalf of the National Conference of Bar Examiners" extensive reports on the investigation of bar applicants in Indiana, including the reports of JLAP and the reports of their small cadre of hand-picked expert witnesses.

213. Prior to this change in the law the Bar Examiners were limited in what they could place in the national bank, said limitation not allowing reports such JLAP's and their small cadre of hand-picked expert witnesses. Order Amending Indiana Rules for Admission to the Bar and the Discipline of Attorneys Rule 2

214. Upon information and belief this change evinces a common plan to send Defendants' allegedly error- and religious intolerance- filled reports into the national bank in a bid to keep Plaintiff and future persons similarly situated to Plaintiff from successfully petitioning any future state bars.

215. Such promulgation of Defendants' reports or reports based upon Defendants' reports will visit grave harm upon Plaintiff.

216. Plaintiff has been offered the opportunity to publish a book detailing his experiences incident to the Indiana bar application process. Plaintiff desires to use as much original material from his processing as available in said book.

217. Plaintiff has identified fourteen categories of documents that he would like to use in his publication, including hearing transcripts, his bar application from Kansas, his certification of good moral character and fitness from the National Conference of Bar Examiners in 2007 and so forth. These categories take in most all of more than seventy witness statements averring to Plaintiff's good moral character from more than 65 witnesses over a more than 15 year period that are now in Plaintiff's record with the Indiana bar, as well as hearing transcripts, correspondence files, legal memoranda and even filings with and orders of the Indiana Supreme Court that are otherwise open documents.

218.    Upon information and belief the Supreme Court of Indiana now claims all of this material as exclusively their own and reserves unto themselves the right to punish Plaintiff for publicizing or speaking of the same.

219.    All fourteen categories are now covered by the allegedly overbroad and vague prior restraint visiting terminology of Rule 19, Admission and Discipline Rules. Plaintiff therefore challenges this Rule which is currently causing Plaintiff to self-censor. Plaintiff's challenge is focused upon the following sections of Rules for the Admission to the Bar and the Discipline of Attorneys, Rule 19

Section 1
All information and all records obtained and maintained by the Board of Law Examiners in the performance of its duty under these rules … shall be confidential ….

Section 2
All materials and information in the possession of or knowledge of the Board of Law Examiners …. Shall be the property of the Supreme Court of Indiana

265.    Upon information and belief all of the foregoing alleges that Plaintiff was the subject of a conspiracy to fail him through the JLAP process by Defendants and others, including the Doe Defendants, acting in collusion and out of biases, invidious discriminatory intent and animus causing them to target him because of his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

## VERIFICATION OF COMPLAINT

I, Bryan J. Brown, a citizen of the United States and a resident of Indiana, have read the foregoing Verified Complaint Regarding Civil Rights Violations, and the factual allegations therein, and declare, under penalty of perjury as defined by the laws of the United States of America, the foregoing factual allegations of all paragraphs are true and correct to the best of my knowledge and recollection.

Date: December 8, 2009

Bryan J. Brown

30

**LEGAL CLAIM #1**
FEDERAL pursuant to 42 USC § 1983
Due Process challenge to Rule 19, Admission and Practice
Fourteenth Amendment based
VIOLATION OF FREE SPEECH (VIA PRIOR RESTRAINT)

Defendant Indiana Supreme Court, by and through Randall T. Shepherd, has erected a vague rule of confidentiality at Rule 19, Admission and Discipline, by failing to define the scope of the possessory interest and failing to define "confidential" as it allegedly affects the authors of works tendered by and through bar applicants and by failing to define who holds the confidences and at what peril they are violated.

**WHEREFORE,** Plaintiff prays for a declaration of law that Rule 19 is void for vagueness. Plaintiff further prays for a permanent injunction against the application of Rule 19.

**LEGAL CLAIM #2**
FEDERAL pursuant to 42 USC § 1983
First Amendment challenge to Rule 19, Admission and Practice
Fourteenth Amendment Incorporation Doctrine invoked
VIOLATION OF FREE SPEECH (VIA PRIOR RESTRAINT)

Defendant Indiana Supreme Court, by and through Randall T. Shepherd, has erected an overbroad rule of confidentiality at Rule 19, Section 1, Admission and Discipline, by asserting an exclusive possessory interest over "all information and all records obtained … by the IBLE, etc."

**WHEREFORE**, Plaintiff prays for a declaration of law that Rule 19 is unconstitutionally overbroad. Plaintiff further prays for a permanent injunction against the application of Rule 19.

**LEGAL CLAIM #3**
FEDERAL pursuant to 42 USC § 1983
First Amendment challenge to Rule 19, Admission and Practice
Fourteenth Amendment Incorporation Doctrine invoked
VIOLATION OF FREE SPEECH (VIA PRIOR RESTRAINT)

Defendant Indiana Supreme Court, by and through Randall T. Shepherd, has erected an overbroad rule of confidentiality at Rule 19, Section 2, Admission and Discipline, by asserting an exclusive possessory interest over "all materials and information in the possession or knowledge of the IBLE, etc."

**WHEREFORE**, Plaintiff prays for a declaration of law that Rule 19 is unconstitutionally overbroad. Plaintiff further prays for a permanent injunction against the application of Rule 19.

**LEGAL CLAIM # 4**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF FREE EXERCISE OF RELIGION

Defendants' actions set forth above served to penalize Plaintiff for freely exercising his religion.

***WHEREFORE,*** Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendants receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 5**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF ESTABLISHMENT CLAUSE

Defendants' actions as documented above raised the postmodern religion of "psychotherapy" over and against Plaintiff's faith tradition and devalued Plaintiff, in Defendant Sudrovech's final report, for failing to show adequate enthusiasm for psychotherapy.

***WHEREFORE,*** Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 6**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF FREEDOM OF BELIEF

Defendants actions as documented above repeatedly allege discrimination against the Plaintiff based upon his belief or lack of belief on myriad subjects protected by the First Amendment, including, but not limited to, the identity of Plaintiff's great enemy, psychotherapy, eternal punishment, the ideal family structure, among other areas of evaluation.

***WHEREFORE,*** Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 7**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF ASSOCIATIONAL FREEDOM

Defendants' actions as documented above demonstrate discrimination against the Plaintiff based upon his particular political associations or identity in the contemporary social schemata defined by the "culture wars," including, but not limited to, most of the reasons that Plaintiff was adjudged narcissistic by Defendant Bowman.

***WHEREFORE***, Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 8**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF BAN AGAINST STATIST ORTHODOXIES

Defendants' actions set forth above, and especially in judging him negatively due to his political and religious opinions revealed through the application of the MMPI-2 and other testing devices and interviews, served to subject Plaintiff to an acid test of orthodoxy.

***WHEREFORE***, Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 9**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIOLATION OF BAN AGAINST STATIST CONFESSIONS

Defendants' actions as alleged above repeatedly discriminate against Plaintiff based upon his failure to confess belief in more post modern dogmas, including, but not limited to psychotherapy (in Defendant Sudrovech's report to the bar examiners).

***WHEREFORE***, Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 10**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
VIEWPOINT DISCRIMINATION

Defendants' actions' set forth above, and especially in judging him negatively due to his viewpoint on abortion, on religion and on such controversial topics as "liberals" and psychotherapy and Lucifer evidence the poison of viewpoint discrimination.

***WHEREFORE,*** Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 11**
FEDERAL pursuant to 42 USC § 1983
Fourteenth Amendment Incorporation invoked
Conspiracy to violate First Amendment rights

Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, to deprive Plaintiff of his constitutional right to be free from political and religious considerations in governmental evaluations.
This was done, among other actions documented above, through interviews, testing instruments, including the MMPI-2, and in official reports and all other allegations of the individuals.

***WHEREFORE***, Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 12**
FEDERAL pursuant to 42 USC § 1983
Conspiracy to violate Fourteenth Amendment Due Process Rights

Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, to deprive Plaintiff of his constitutional right to due process of the law in governmental proceedings.
This was done, among other acts detailed above, through interviews, testing instruments, including the MMPI-2, in official reports and in the fashion in which the applicant was processed by Defendants, including, but not limited to, the refusal to prep Plaintiff's designated expert witness.

***WHEREFORE,*** Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

34

**LEGAL CLAIM # 13**
FEDERAL pursuant to 42 USC § 1983
Conspiracy to violate Fourteenth Amendment Equal Protection Rights

> Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, to deprive Plaintiff of his constitutional right to equal protection of the law in governmental proceedings.
> This was done, among other acts documented above, through interviews, testing instruments, including the MMPI-2, in official reports, in the fashion in which the laws, rules and regulations were applied to Plaintiff.

*WHEREFORE*, Plaintiff prays for a declaration of law that Defendants violated his First Amendment rights. Plaintiff further prays for nominal and compensatory damages against Defendants for such violations. Plaintiff further prays for an order in equity that all Defendant receive advance training in the First Amendment and the limitations on state action.

**LEGAL CLAIM # 14**
STATE COMMON LAW CLAIM
"Document Conversion"

> Defendant Ross ordered Plaintiff to surrender his work product.
> Plaintiff claimed a right in this work product.
> Defendant Ross refused to tender work product to Plaintiff upon request.

*WHEREFORE,* Plaintiff prays for an order that his work product be returned to him.

**LEGAL CLAIM # 15A** (Pled in the alternative)
STATE COMMON LAW CLAIM
"Billing Fraud"

> Defendant Ross tendered a unilaterally amended bill to Plaintiff.

*WHEREFORE*, Plaintiff prays for compensatory and exemplary damages.

**LEGAL CLAIM # 15B** (Pled in the alternative)
STATE STATUTORY CLAIM
"Incurable Deceptive Act"

> Defendant Ross' billing thus constitutes an "incurable deceptive act" pursuant to IC § 24-5-0.5-2(a)(8).

*WHEREFORE*, Plaintiff seeks statutory damages of $500 pursuant to IC § 24-5-0.5-4(a).
Plaintiff prays for increased damages pursuant to IC § 24-5-0.5-4(a)(2).
Plaintiff prays for attorneys fees pursuant to IC § 24-5-0.5-4(a)(2).

35

**LEGAL CLAIM # 15C** (Pled in the alternative)
STATE STATUTORY CLAIM
"Civil Deception" Indiana Code § 35-43-5-3(a)(2)-(3) and § 34-24-3-1

Defendant Ross tendered an altered billing statement to Plaintiff.

***WHEREFORE,*** Plaintiff prays that the Court grants Plaintiff treble damages, costs, and attorney's fees.

**LEGAL CLAIM # 16**
STATE STATUTORY CLAIM
"Incurable Deceptive Act"

Defendant Bowman's services to Plaintiff constituted consumer transactions pursuant to IC § 24-5-0.5-2(a)(1).

***WHEREFORE,*** Plaintiff seeks statutory damages of $500 for each act pursuant to IC § 24-5-0.5-4(a). Given that misreporting of Dr. Bill Alexy's conclusions were most egregious the Plaintiff prays for increased damages pursuant to IC § 24-5-0.5-4(a)(2) for that act. Plaintiff prays for attorneys fees pursuant to IC § 24-5-0.5-4(a)(2).

**LEGAL CLAIM # 17(a)** (Pled in the alternative)
STATE COMMON LAW CLAIM
"Constructive Fraud"

Defendant Bowman's services to Plaintiff constituted a confidential and fiduciary-like relationship.

***WHEREFORE,*** Plaintiff prays for an order that Dr. Bowman's report be declared null and void for all legal purposes. Plaintiff prays that this Court issues an injunction against the promulgation of Dr. Bowman's report on Plaintiff or any report of the State of Indiana utilizing Dr. Bowman's report. Plaintiff further prays for compensatory damages. Plaintiff further prays for an order that Dr. Bowman to quarantine her notes and work product from sessions with Plaintiff until the same can be destroyed and to produce no docudrama, newsletters, seminars or books using said notes or observations. Plaintiff prays for punitive damages, stating that the Court can conclude on the facts at bar that Dr. Bowman's acts herein were oppressive.

**LEGAL CLAIM # 17(b)** (Pled in the alternative)
STATE COMMON LAW CLAIM
"Substantive unconscionability "

Defendant Bowman's services to Plaintiff constituted a contract.

***WHEREFORE,*** Plaintiff prays for an order that Dr. Bowman's report be declared null and void for all legal purposes. Plaintiff prays that this Court issues an injunction against the promulgation of Dr. Bowman's report on Plaintiff or any report of the State of Indiana utilizing

Dr. Bowman's report. Plaintiff further prays for compensatory damages. Plaintiff further prays for an order that Dr. Bowman to quarantine her notes and work product from sessions with Plaintiff until the same can be destroyed and to produce no docudrama, newsletters, seminars or books using said notes or observations. Plaintiff prays for punitive damages, stating that the Court can conclude on the facts at bar that Dr. Bowman's acts herein were oppressive.

**LEGAL CLAIM # 18**
STATE COMMON LAW CLAIM
"Actual Fraud"

Defendant Bowman's misrepresentation of the Dr. Alexy report tends to deceive all who read her report as to what Dr. Alexy actually concluded as to Plaintiff.

***WHEREFORE,*** Plaintiff prays for an order that Dr. Bowman's report be declared null and void for all legal purposes. Plaintiff prays that this Court issues an injunction against the promulgation of Dr. Bowman's report on Plaintiff or any report of the State of Indiana utilizing Dr. Bowman's report. Plaintiff further prays for compensatory damages. Plaintiff further prays for an order that Dr. Bowman to quarantine her notes and work product from sessions with Plaintiff until the same can be destroyed and to produce no docudrama, newsletters, seminars or books using said notes or observations. Plaintiff prays for punitive damages, stating that the Court can conclude on the facts at bar that Dr. Bowman's acts herein outrageous.

**LEGAL CLAIM # 19**
STATE COMMON LAW CLAIM
"Malicious Defamation"

Defendant Elizabeth Bowman's misrepresentation in her official report of Dr. William Alexy's conclusion as to Plaintiff's mental health is a communication intended to injure Plaintiff's reputation, reduce confidence in the Plaintiff and/or excite derogatory opinions about the Plaintiff.

***WHEREFORE,*** Plaintiff prays for an order that Dr. Bowman's report be declared null and void for all legal purposes. Plaintiff prays that this Court issues an injunction against the promulgation of Dr. Bowman's report on Plaintiff or any report of the State of Indiana utilizing Dr. Bowman's report. Plaintiff further prays for compensatory damages. Plaintiff further prays for an order that Dr. Bowman to quarantine her notes and work product from sessions with Plaintiff until the same can be destroyed and to produce no docudrama, newsletters, seminars or books using said notes or observations.

**LEGAL CLAIM # 20**
STATE COMMON LAW CLAIM
"Tortuous Interference"

Upon briefing Dr. Bowman prior to Plaintiff's visit Tim Sudrovech instructed Dr. Bowman to not render an opinion on the ultimate issue of Plaintiff's fitness or moral character as did Dr. Ross.

37

*WHEREFORE*, Plaintiff prays that the Court adjudge Defendant Sudrovech liable for such interference and order that he pay compensatory damages in the amount of $680 to Plaintiff and that the Court order the expert opinion of Dr. Bowman be declared null and void for all legal purposes. Plaintiff prays that this Court issues an injunction against the promulgation of Dr. Bowman's report on Plaintiff or any report of the State of Indiana utilizing Dr. Bowman's report. Plaintiff further prays for compensatory damages. Plaintiff further prays for an order that Dr. Bowman to quarantine her notes and work product from sessions with Plaintiff until the same can be destroyed and to produce no docudrama, newsletters, seminars or books using said notes or observations.

**LEGAL CLAIM # 21**
STATE LEGAL CLAIM
INDIANA CONSTITUTION
Conspiracy to violate rights

Section 2. All people shall be secured in the natural right to worship ALMIGHTY GOD, according to the dictates of their own consciences.

> Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, in an attempt to coerce Plaintiff to abandon or compromise his constitutional right to be free to worship ALMIGHTY GOD through fidelity to His teachings and laws, according to the dictates of Plaintiff's conscience.

*WHEREFORE,* Plaintiff prays for a declaration of law that Defendants violated his Indiana constitutional rights. Plaintiff further prays for an order that Defendants be sent to sensitivity training on the need to respect differing religious perspectives than their own.

**LEGAL CLAIM # 22**
STATE LEGAL CLAIM
INDIANA CONSTITUTION
Conspiracy to violate rights

Section 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no person shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent.

> Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, in an attempt to prefer the religion of Dr. Bowman over Plaintiff's religion and to present Plaintiff's creed as one not preferred by the State.

> Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, in an attempt to cause Plaintiff to support the ministry of psychotherapy against his conscience and to present Plaintiff's disdain for supporting such a secularist ministry as a belief not preferred by the State.

38

*WHEREFORE,* Plaintiff prays for a declaration of law that Defendants violated his Indiana constitutional rights. Plaintiff further prays for an order that Defendants be sent to sensitivity training on the need to understand that no preference to any creed means benevolent tolerance, not forced compliance with a creedless secularism.

**LEGAL CLAIM # 23**
STATE LEGAL CLAIM
INDIANA CONSTITUTION
Conspiracy to violate rights

Section 5. No religious test shall be required, as a qualification for any office of trust or profit.

> Defendants Bowman, Ross, Sudrovech and Harrell willfully and knowingly acted, either alone or in combination, to subject Plaintiff to a series of tests inquiring of Plaintiff's religion as a prerequisite to Plaintiff being evaluated through JLAP, including, but not limited to, the MMPI-2.

*WHEREFORE*, Plaintiff prays for a declaration of law that Defendants violated his Indiana constitutional rights. Plaintiff further prays for an order that Defendants be sent to sensitivity training to aid them in the difficult task of determining which psychological examinations, if any, can be used on those remanded to their care by government actors.

**LEGAL CLAIM # 24**
STATE LEGAL CLAIM
INDIANA CONSTITUTION
Free Interchange of thought and opinion

Section 9. No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

> Defendant Supreme Court maintains, at Rule 19, a stricture upon the free interchange of thought and opinion. This rule is restricting Plaintiff and causing him to self-censor.

*WHEREFORE,* Plaintiff prays for a declaration of law that Rule 19 violates his Indiana constitutional rights.

**LEGAL CLAIM #25**
FEDERAL  pursuant to 42 USC § 1983
Due Process challenge to announced changes to Rule 23 § 20, Admission and Practice
Fourteenth  Amendment based

> Defendant Indiana Supreme Court, by and through Randall T. Shepherd, is erecting a rule
> that will allow, encourage and immunize those who commit slander or libel or other
> frauds against pending bar applicants through written or oral reports that are not subject
> to the rigors of due process, including cross examination and confrontation.  This system
> threatens to visit harms upon the constitutional rights of future and current bar applicants
> and encourages a "secret police" like regime on the Board of Law Examiners that may be
> easily misused for ideological purposes.

**WHEREFORE,** Plaintiff prays for a declaration of law that the announced changes to Rule 23 §
20 are violations of the due process clause of the Fourteenth Amendment. Plaintiff further prays
for a permanent injunction against the application of Rule 23 § 20.

**LEGAL CLAIM #26**
FEDERAL  pursuant to 42 USC § 1983
Due Process challenge to announced changes to Rule 2, Admission and Practice
Fourteenth  Amendment based

> Defendant Indiana Supreme Court, by and through Randall T. Shepherd, is erecting a rule
> that will allow, encourage and promulgate reports and finding based in fraud,
> inaccuracies or political correctness doctrines to a national database.  This system
> threatens to visit harms upon the constitutional rights of future and current bar applicants
> and encourages a "secret police" like regime on the Board of Law Examiners that may be
> easily misused for ideological purposes and then have negative impact and effect far
> beyond the borders of the State.

**WHEREFORE,** Plaintiff prays for a declaration of law that the announced changes to Rule 23 §
20 are violations of the due process clause of the Fourteenth Amendment. Plaintiff further prays
for a permanent injunction against the application of Rule 23 § 20.

**WHEREFORE**, plaintiff requests that this Court:

a.    Accept jurisdiction of this cause.

b.    Adjudicate all matters of law herein pled;

c.    Award Plaintiff all remedies requested at conclusion of each legal claim;

d.    Award plaintiff his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

e.    Equitably relieve Plaintiff of the inequitable burdens now placed upon him and that are threatened to come upon him and others after January 1, 2010 through the promulgation of the Bowman, Sudrovech and Ross reports and absolute immunization of any and all who issue secret reports, written or oral, to the government authorities determining who can be admitted to the Indiana bar .

f.    Issue equitable relief mandating that Defendants create and fund programs designed to ensure that the constitutional rights of those assigned to JLAP are not violated incident to mental health evaluations and purging from the JLAP program ideologically-biased materials, programs and personnel;

g.    Award all other proper relief the Court deems just and mete.


Respectfully submitted,


Bryan J. Brown
Pro se
827 Webster Street
Fort Wayne, IN 46802
(260) 515-8511
brown1634@gmail.com
Attorney for Plaintiff


41

**Appendix:**
**Questions that I request answered before further**
**professional psychological or psychiatric review at the State's command.**

Here are six of the many questions from the Minnesota Multiphasic Personality Index that I found troubling. (I was forced to answer yes or no without explanation):

1. Do you believe that you should be punished for your sins?
2. Do you believe that the husband should be head of the family?
3. Do you have strong political opinions?
4. Do you believe that a multitude of people are involved in sexual sins?
5. Have you ever had a vision?
6. Have you even seen a ghost or a spirit?

All of these questions are discussed in the Bible and the Catholic catechism. All of these questions are at the heart of my religious faith. All of these questions are of primary importance to me.

Since it appears that my answers to these interrogatories were, at least in part, the basis for keeping me from being approved to become an Indiana-licensed attorney, I have determined it best to be completely open with the State and reveal my beliefs and commitment to my Lord and Savior on all of these important topics.[31] We can then discuss more fully when we meet in peson the questions to which I gave the "wrong answer". (Wrong being defined as that answer which furthered the State of Indiana's conclusion that I must undergo psychiatric counseling before my admission can be moved any further.)

1. The "my sins" question:    The Christian faith has held from its beginning, as did its forerunner, that we all are guilty of sin and deserving of punishment:   "When I did not confess my sins, I was worn out from crying all day long. Day and night you punished me. Lord: my strength was completely drained, as moisture is dried up by the summer heat. Then I confessed my sins to you, I did not conceal my wrongdoings. I decided to confess them to you, and you forgave all my transgressions." Psalm 32.

A standard refrain in the Catholic Church is "Lamb of God, who takes away the sins of the world, have mercy on us." I reject the notion that so praying, or so believing while so reciting, renders one open to the charge of being dysfunctional, hypomanic, or "too emotional." I also

---

[31] I realize that Dr. Ross has warned me to not be so open and zealous about "my truth," but I also realize that Rule 12 demands that I communicate with the Board in "full candor," seeking, first and foremost, to emulate "honesty, fairness and candor." I have thus decided to join JLAP in the practice of ignoring Dr. Ross' report and pressing ahead with my psychological inquest.

26

Exhibit A

resent the State of Indiana's seeming allegation that so believing renders me one in need of psychiatric services.

I am simply at a loss to understand why the State is interested in my view of harmatology (i.e., the doctrine of sin) and how the State thinks it can ask me such a question. I seek an explanation from the Indiana officials managing this process as to how knowing my view of my own state of grace aids the State of Indiana in deciding whether I should be licensed to practice law.

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory. Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys to this secularizing oracle.

2. The traditional family question. The traditional understanding of the Christian Faith affirms this patriarchal sociology. http://www.scripturecatholic.com/husband_headship.html

At the risk of subjecting my entire family to psychiatric scrutiny, we are currently praying a Novena of Saint Joseph compiled by Father Tom Lombardi of the diocese of Fort Wayne/South Bend. That Novena includes the following lines: All fatherhood in heaven and earth has its origin in God. Let us turn toward our heavenly Father and pray."

I am at a loss to understand why the State is interested in my view of the ideal family situation.

I seek an explanation from the Indiana officials managing this process as to how knowing my view of a husband/father's proper role in our social order aids the State of Indiana in deciding whether I should be licensed to practice law.

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory. Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys to this exercise in post modern sociology.

3. The political opinions question. My strong political opinions arise out of my Christian worldview. I believe that Jesus Christ is the King of kings and will one day return in glory to govern the living and the dead. I do hold this opinion with as much certainty (and fervor) as I can muster. (It is not rare, being found in all the major creeds of Christendom.)

The Saint Joseph Novena quotes the following from the Scriptures: "Put no trust in princes, in mortal men in whom there is no help. Take their breath, then return to clay and their plans that day come to nothing....It is the Lord who loves the just buy thwarts the path of the wicked. The Lord will reign forever; Sion's God from age to age." Also on the theme of politics, the Novena

27

asks that "prayers obtain for us the strength to flee from error and wrestle with the powers of corruption …"

-I seek an explanation from the Indiana officials managing this process as to how knowing the strength of my political opinions aids the State of Indiana  in deciding whether I should be licensed to practice law.[32]

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory.  Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys  to this Orwellian examination.

4.  The sexual sins question.  My parish priest daily prays for "an end to abortion and its cause, which is rampant sexual immorality."  Jesus taught that the way to Life is narrow, and the road to destruction is broad.  This is commonly interpreted as  a teaching that most people reject the morality taught in the Bible.

The Saint Joseph Novena has me praying "guard me from the evil of these times, from the worship of riches, from the destructive pursuit of pleasure and from the pride that blinds me to the perfect law of Christ."  Indeed and amen!

I seek an explanation from the Indiana officials managing this process as to how knowing my religiously informed moral perspective on other people's sexual  aids the State of Indiana  in deciding whether I should be licensed to practice law.

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory.  Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys  to this Keynesian inquisition.

5.  The visions question. The Holy Scriptures (Acts of the Apostles) present visions as normative for    the    Christian.    Catholicism    teaches    the    same,    see,    e.g., http://www.newadvent.org/cathen/15477a.htm

The Saint Joseph Novena turns again to the Scriptures for this reading that the MMPI-2 must find suspect at best: "When the angels went away from then to heaven, the shepherds said to one

---

[32] It is possible that the MMPI-2 compared my religious answers to my political answers and flagged me as non-normative.  I do imagine that my views on religion and politics deviates from most of the population at large.  I do not believe this renders me a moral deviant, it renders me merely a socio-political dissident.  While these were equal in Soviet Russia (see my July 30 letter) they should not be considered equal in our constitutional republic.

28

another, 'Let us go, then, to Bethlehem to see this thing that has taken place, which the Lord has made known to us.'" One who really believes this and responds accordingly on the MMPI-2 may find himself ordered to see a psychiatrist. This is the anti-Christian bias at the very heart of psychology and psychiatry, as I document in my letter of July 30, 2008.

I seek an explanation from the Indiana officials managing this process as to how the question of whether I have ever had a religious apparition aids the State of Indiana in deciding whether I should be licensed to practice law.

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory. Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys to this esoteric evaluation.

6. The spirit, ghost (or angel) question. Roman Catholicism is rife with ancient accounts of such activity, as is the Old Testament. Christian teaching has held, from the very beginning, that Jesus Christ is risen from the dead, thus making him, in the thoughts of some, a "ghost-like" being. In the Apocalypse the word spirit is rendered angel in the seven letters to the churches. Many have claimed to have seen ghosts, spirits and/or angels since the dawn of time.

The Saint Joseph Novena turns again to the Scriptures for this reading that modern psychiatry considers treatable through anti-psychotic medication: "...the angel of the Lord appeared to Joseph in a dream and said, "Rise, take the child and his mother, flee to Egypt, and stay there until I tell you [otherwise]."

I am at a loss to understand why the State is interested in the question of contact with spiritual beings? I seek an explanation from the Indiana officials managing this process as to how knowing whether I believe that I have had an experience with the supernatural aids the State of Indiana in deciding whether I should be licensed to practice law.

I further seek an explanation from the Indiana officials managing this process as to whether "yes" or "no" was the correct answer to this official interrogatory. Dr. Ross should be able to aid the State in the answer to that question, since he holds the interpretative keys to this spiritual assessment.

I am keenly interested in receiving explanations to the question posed above before I venture any deeper into the "psychiatric" testing that JLAP continues to seek. It is my reasonable belief (based upon my discussions with him) that Dr. Ross was directed to administer the MMPI-2 to me and to do so before I could research and object to the same. I have to assume that those managing my case who have experience in the "soft sciences" knew that the MMPI-2 contains religious and very intrusive questions, and that the MMPI-2 has been critiqued for that very

29

reason.

Thus the decision to probe my worldview, and especially as it is informed by my strongly held political and religious opinions, must have been a deliberate one.    I hope the more complete answers above are helpful, and hope that further dialogue on the State's interest in these overtly religious topics (often asked of those seeing the Catholic priesthood) will bring forth even more light on my religious fervor that already troubles the State.

It should be evident that I believe I would greatly benefit from the State of Indiana's answers to the above questions, for I could then more fully appreciate what it is the State of Indiana wants from me as a person of faith.  I can then determine if my conscience will allow me to give the State the answers it wants to the religious questions above, or if I must stand on my religiously-informed conscience even if it means being denied the privilege of practicing law in Indiana.

I must come to this decision as to the degree to which I will compromise my core beliefs and religious identify before meeting with any more mental health professionals, and so must ask again for a meeting with JLAP officials in the first weeks of September.

My schedule is flexible.  Please call me and let me know when we can so meet.

If you have decided to not meet with me in person, or at least not until I first meet with the state's designated psychiatrist, then please be so kind as to notify me of that as well.   If calling me is too difficult then please email any notices.

30

St. Joseph ✪ Medical Cen...

# Psychiatric Care

415 E. Cook Road, Suite 100 • Fort Wayne, IN 46825 • Phone 260.485.

RECE...ED

State Boar...
Law Exam...

May 1, 2009

Re: Bryan J. Brown
DOB: 1-25-1959

To Whom It May Concern:

Mr. Bryan J. Brown has asked me to provide a summary of my psychiatric evaluation of him relative to his upcoming judgment by the Judges and Lawyers' Assistance Program. He has provided me with the criteria against which he will be reviewed.

My sessions with Mr. Brown occurred on 9-16-08 and 10-13-08 at his request. I have also reviewed additional psychological testing results which he provided to me.

Regarding "good moral character," it is my opinion that Mr. Brown **DOES MEET** this standard without question. He appears to hold to his personal and spiritual convictions without wavering. He expresses a clear respect for the law and the judicial process. However, his actions have apparently brought him into conflict with some legal entities in the past, but I believe it was not his primary intent to break the law.

Regarding "fitness," it is my opinion that Mr. Brown **DOES MEET** this standard. I am not qualified to comment on his interactions with the legal process or his fiduciary responsibilities. However, based on my evaluations, Mr. Brown possesses the mental stability required by your guidelines. I found him to have very strong opinions, which he based on extensive evidence gathered from multiple sources. He is passionate about his faith, family and work. He is highly energetic and very focused on his goals, and these characteristics appear to be very consistent. He approaches his goals in a logical fashion and does not appear to be impulsive, delusional, or grandiose.

I hope this information is helpful to you in considering Mr. Bryan J. Brown for admission to the Indiana Bar.

Sincerely,

*Bryan E. Flueckiger MD*

Bryan E. Flueckiger, MD

**EXHIBIT**

Exhibit B