FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

2010 MAR 29  PM 3: 49

STEPHEN R. LUDWIG CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

BRYAN J. BROWN,                              )
                                             )
                        Plaintiff,           )
                                             )
        v.                                   )        No. 1:09 CV 346
                                             )
                                             )        Judge Theresa Springmann
DR. ELIZABETH BOWMAN,                        )        Magistrate Paul Cherry
TERRY HARRELL, individually and in her       )
official capacity as Executive Director of   )        ORAL ARGUMENT REQUESTED
the Judges and Lawyers Assistance Program,   )
TIM SUDROVECH, individually,  and in his     )
official capacity as Clinical Director of    )
the Judges and Lawyers Assistance Program,   )
DR.  STEVEN ROSS,                            )
JOHN DOES and JANE ROES, co-conspirators,    )
And RANDALL SHEPARD, in his official         )
capacity as Chief Justice of the Indiana Supreme )
Court,                                       )
                                             )
                        Defendants.          )
                                             )

PLAINTIFF'S REPONSE TO DEFENDANTS' MOTIONS TO DISMISS

<u>Issue</u>

Does Plaintiff's verified complaint pass muster under Fed.R.Civ.P. 12(c)?

*Comes now, Plaintiff,* and files the following response to Defendants' Motions and
Memoranda to dismiss.  Plaintiff has followed the Defendants' outlines, as is revealed in this
document's table of contents.  This document is filed timely and within the pre-authorized
pagination limit.

i

I. STANDARDS OF REVIEW .................................................................................................. 1
    a.   The Fed.R.Civ.P. 12(b)(1) Standard ......................................................................... 1
    b.   The Fed.R.Civ.P. 12(b)(6) Standard ......................................................................... 1
    c.   The Fed.R.Civ.P. 12(c) Standard ............................................................................. 2
    c.   Special considerations .............................................................................................. 3
*II. Initial Matters Worthy of Comment* ...................................................................................... **4**
    a.   Plaintiff did not name the Board of Law Examiners in this action ........................... 6
    b.   Plaintiff has sought relief against government actors .............................................. 6
    c.   Plaintiff seeks mostly equitable and declaratory relief in this public interest action. .................. 6
    d.   Plaintiff presents a facial challenge in this action. ................................................. 6
    e.   The Office of Attorney General is not alleged to be witnesses in this action. ........................... 5
*III. Rebutting the Government Defendants' Arguments* .......................................................... **8**
    "A. There is no case or controversy before this Court." ............................................... 9
    "B. This suit is barred by the Rooker-Feldman doctrine." ........................................... 13
    "C. Plaintiff's claims are barred because of Eleventh Amendment immunity." ................ 20
    "D. Defendants are not 'persons' under 42 U.S.C. § 1983" ......................................... 22
    "E. Defendants are not liable because they had no personal involvement in the activities about
    which Plaintiff complains." ........................................................................................ 23
    "F. Plaintiff's claims fail when analyzed under the requirements necessary for claims under
    the First Amendment." ............................................................................................... 24
    "G1. Admission and Discipline Rules 2, 19 and 23 have no relevance or application to these
    Defendants." ...............................................................................................................
    "G2 Rule 31 confers immunity on Harrell and Sudrovech" ......................................... 28
    "H. Chief Justice Shepard is entitled to absolute judicial immunity from all claims made
    against him by Brown." ...............................................................................................
    "I. Harrell and Sudrovech are entitled to quasi-judicial absolute immunity" ................... 29
    "J. There is no damages remedy for the alleged violations of Indiana Constitutional
    provisions" ..................................................................................................................
    "K. These Defendants are immune from suit under the Indiana Tort Claims Act" ...............
    "L. Plaintiff fails to state any legally sustainable claim for conspiracy or collusion" ............ 31
    "M. There has been no tortuous interference with any of Plaintiff's business relationships." ............
*III. Rebutting Defendant Dr. Steven Ross' Arguments* ........................................................ **33**
    "A. Plaintiff's Complaint on Its Face Violates the Federal Rules of Procedure" ................ 34
    "B. The Court Lacks Jurisdiction … Rooker-Feldman Doctrine …" ................................. 35
    "C. Under the Doctrine of Res Judicata" ...................................................................... 36
    "D. Dr. Ross Was Not a State Actor" ............................................................................ 38
    "E. Plaintiff has no …. Right Secured by the Constitution of the United States" ............... 40
    "F. Court Lacks Jurisdiction to Hear Plaintiff's State Law Claims" ................................. 40
    "G. Plaintiff has Failed to Allege the Billing Fraud Claims with Adequate Specificity." ............... 40
    "H. Plaintiff has Failed … Conversion Claim." ............................................................. 42
    "I. There is no Private Right of Action under the Indiana Constitution" ........................... 42
*IV. Rebutting Defendant Elizabeth Bowman's Arguments* .................................................... **44**
    " II. Statement of Facts" ............................................................................................... 44
    "A. Claims Arising Under the United States Constitution Fail As A Matter of Law." .............. 45

"1. Mr. Brown's Conspiracy Claims Pursuant to 42 USC § 1983 Fail as a Matter of Law" ............. 45
"a. Dr. Bowman was not Acting "Under the Color of State Law." ................................................... 45
"2. Dr. Bowman is Immune from § 1983 Liability." ........................................................................ 46
"a. Dr. Bowman is Immune under the 'Functional Approach." ........................................................... 46
"2. Dr. Bowman is Immune from § 1983 Liability." ........................................................................ 49
"b. Dr. Bowman is Entitle to Eleventh Amendment Immunity." ........................................................ 49
"(D) Mr. Brown's State Law Claims" (Bowman) ............................. **Error! Bookmark not defined.**
1.   Mr. Brown's state law claims are superseded by the Medical Malpractice Act. (Bowman)" ..... 51
2.   "Dr. Bowman's Services to Mr. Brown Did Not Constitute a Consumer Transaction and,
Therefore, his Claim for 'Incurable Deceptive Act' is Without Merit" ............................................. 52
5. "Mr. Brown's Claims for 'Substantive Unconscionability' Fail as a Matter of Law" .................. 52
6. "Mr. Brown's Claim for "Malicious Defamation" Fails as a Matter of Law." ............................. 53
"(E) Abstain ... Pursuant to Rooker/Feldman or Younger                              54
*CONCLUSION* ................................................................................................................................... *55*

## Cases

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937). ........................................................................... 1
*Astoria Fed. Sav. & Loan Assn. v. Solimino*, 111 S.Ct. 2166 (1991) ..................................................... 38
*Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) .................................................................................. 9
*Barichello v. McDonald*, 98 F.3d 948, 955 (7th Cir.1996). ................................................................. 55
*Bell v. Twombly*, 127 S.Ct. 1955 (2007) ............................................................................................. 2
*Bennett v. County of Suffolk*, 30 F. Supp. 2d 353 (E.D.N.Y. 1998), ..................................................... 28
*Cantrell v. Morris*, 849 N.E.2d 488 (Ind.2006) ........................................................................... 23, 43
*Centres, Inc. v. Town of Brookfield*, 148 F.3d 669, 702-03 (7th Cir.1998) ............................................ 1
*City of Los Angeles v. Preferred Communications*, 476 U.S. 488, 494 (1986) ...................................... 4
*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) ............................ 54
*Computers Unlimited v. Midwest Data Sys.*, 657 N.E.2d 165, 171 (Ind.Ct.App.1995). ......................... 42
*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), .................................................................................... 2
*Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993) ........................................ 3
*Crenshaw v. The Supreme Court of Indiana*, 170 F.3d 725 (7thCir.1999) ........................................... 54
*Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir.2003). ............................................................................ 4
*Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548, 555 (7th Cir.1996). ............................................. 4
*Eisenberg v. Sternberg*, 641 F.Supp. 620 (W.D. Wisc., 1986 ............................................................. 47
*Edwards v. Ill. Bd. Of Admissions*, 261 F.3d 723 (7th Cir. 2001) ....................................................... 17
*Exxon Mobil Corp., v. Saudi Basic Indus. Corp.*, 125 S.Ct. 1517, 1521(2005). ............................. 15 - 19
*Fries v. Helpser*, 146 F3d 452, 457-58 (7th Cir.1998)
*GASH Associates v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir.1993) ....................................... 16
*GATX Leasing Corp. v. National Union Fire Ins. Co.*, ............................................................................ 3
*Guttman v. Khalsa*, 401 F.3d 1170 (10th Cir.2005). ...................................................................... 18 - 19
*Highway J Citizens Group v. United States DOT*, 456 F.3d 734 (7th Cir. 2006) ................................... 39
*Hood v. Keller*, 341 F.3d 593, 597 (6 th Cir.2003) ............................................................................ 17
*In Re Applicant* 24128 .......................................................................................................................... 37
*In Re Evirodyne Industries, Inc.*, 29 F.3d 301, 303-04 (7th Cir.1994
*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998) ................................................ 4
*Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir.1997), ............................................... 20
*Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 510 (7th Cir.1996) ................................................ 16

*Kaba v. Stepp*, 458 F.3d 678 (7th Cir.2006): ........................................................................ 4, 8

*Larsen v. City of Beloit*, 130 F.3d 1278, 1282 (7th Cir.1997). ................................................ 25

*Lawson v. Hale*, 902 NE 2d 267 (Ind.App.2009). ................................................................. 42

*Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 555 (7th Cir.1999) ......................................... 16

*Lugar v. Edmonson Oil Co.*, 457 U.S. 922 (1982). ................................................................. 39

*Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir.2006). ........................................................... 3

*McConnell v. McKillip*, 573 F.Supp.2d 1090 (S.D.IN 2008) .................................................. 49

*Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432-37 (1982) ............ 54

*Mitchell v. Fishbein*, 377 F.3d 157 (2d Cir. 2004) ................................................................. 14

*Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ....................................................................... 22

*Moore v. New York Cotton Exchange*, 270 U.S. 593 (1926). .................................................. 41

*In Re Summer*, 325 U.S. 561 (1945) ....................................................................................... 8

*Pennhurst State School and Hospital v. Halberman*, 465 U.S. 89 (1984) .............................. 50

*Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952). ............................................ 11

*R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir.1989). ....................... 5

*Riley v. Vilsack* ....................................................................................................................... 2

*Rouse v. Judges of the Circuit Court*, 609 F. Supp. 243 (N.D.Ill.1985), ................................ 47

*Sansville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir.2001) ................................................. 24

*Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921)' ....................................... 13

*Steffel v. Thompson*, 415 U.S. 452 (1974). ........................................................................... 12

*United States Parole Comm. V. Geraghty*, 445 U.S. 388, 397 (1980) .................................... 12

*United States v. Lockheed-Martin Corp.*, 328 F.3d 374 (7thCir.2003) .................................. 36

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir.2006). ..................................................... 19 - 21

*Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004 (7th Cir.1990) ............................ 4

*Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin*, 747 F.2d 407 (7th Cir.1984 ......... 10

## Statutes

Indiana Code § 24-5-.05-2. ...................................................................................................... 42

Indiana Code § 24-5-.05-1 ....................................................................................................... 42

Kansas and Indiana Rules of Professional Conduct, § 8.5. ..................................................... 29

Rules of Civil Procedure 8 and 9 ............................................................................................ 35

F.R.C.P. 9. ................................................................................................................................ 3

**Fed.R.Civ.P. 12(b)(1)** ....................................................................................................... 1, 10

**Fed.R.Civ.P. 12(b)(6)** ............................................................................................................. 2

## Other Authorities

BLACK'S LAW DICTIONARY .................................................................................................... 51

Erwin Chemerinsky, FEDERAL JURISDICTION, 1994, ....................................................... passim

Eleventh Amendment of the Constitution of the United States. ............................................... 21

REDISH, JUDICIAL REVIEW AND THE 'POLITICAL QUESTION' 79 NW.U.L. REV. 1031 (1985). ............... 13

RELIGION, THE PUBLIC SQUARE, AND THE PRESIDENCY ......................................................... 28

WRIGHT & MILLER, THE FEDERAL JUDICIAL SYSTEM ........................................................... 22

## I. STANDARDS OF REVIEW

Defendants Sudrovech, Harrell, Shepard and Bowman err by not setting out the applicable standards of review on brief. The three applicable standards at this point in the proceedings are those arising under FRCP 12(b)(1), 12(b)(6) and 12(c).

### a. The Fed.R.Civ.P. 12(b)(1) Standard

Fed.R.Civ.P. 12(b)(1) allows a party to assert the defense of lack of subject matter jurisdiction by motion. When deciding such a motion, "it is well-settled that the complaint will be construed broadly and liberally, in conformity with the general principle set forth in Rule 8(f). WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (2004). However, "once a factual attack is made on the federal court's subject matter jurisdiction, the district judge is not obliged to accept the plaintiff's allegations as true and may examine the evidence to the contrary and reach his or her own conclusions on the matter." *Id. See also, Trentacosta v. Frontier Pac. Aircraft Indus.*, Inc., 813 F.2d 1553, 1558 (9th Cir.1987).

Thus the subset of the Defendants' motions that raise questions as to subject matter jurisdiction are ripe for review on the face of the Plaintiff's complaint and anywhere else that the Court may locate evidence facilitating a conclusion as to subject matter jurisdiction.

### b. The Fed.R.Civ.P. 12(b)(6) Standard

Issues beyond subject matter jurisdiction are to be judged against a different standard. For decades that standard was taken from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), advising the court to accept as true all of the plaintiff's allegations "unless" they appear implausible "beyond a reasonable doubt." It appears that this standard has been abrogated by *Bell v. Twombly*, 127 S.Ct. 1955 (2007),

v

authorizing the reviewing court to ask if the plaintiff presents a minimally conceivable theory leading to recovery.  Thus Defendant Steven Ross' encouragement to review Plaintiff's complaint under the well worn and quite deferential "no set of facts" formula must be disregarded.

Federal Judge Barbara Crabb recently explained:

> In place of the "no set of facts" standard, the Court held that Rule 8 requires plaintiffs to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570 [], and that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555 []. The Court reasoned that "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" success on the claim "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief.' " *Id.* at 557 [].

*Riley v. Vilsack*, 665 F.Supp.2d 994,1000 (W.D.Wisc, 2009).

Thus the mere notice pleading (to which Defendant Ross wishes to pare down Plaintiff's complaint) has been eclipsed by a seemingly heavier burden, a pleading burden allowing, yea, even encouraging, the setting forth of more, and not less, of a theory of the case.  Defendant Ross complains, wrongfully, that Plaintiff-at-bar has done just that.  This argument from the Ross memo is unavailing given this unnoted (by all Defendants) change in the Plaintiff's burden and coupled with the heightened pleading demands of F.R.C.P. 9.

### c.  The Fed.R.Civ.P. 12(c) Standard

Rule 12(c) motions are to be reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). A Rule 12(c) motion is granted only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993) (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir.1989)). Thus to succeed, the moving party must demonstrate that there are no material issues of fact to be resolved. When reviewing the material facts at this stage in the litigation the Court must "view the facts in the complaint in the light most favorable to the nonmoving party," *GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir.1995).

2

The above statement is crucial in the analysis of much of the motion and memoranda filed by Defendants Harrell, Sudrovech and Shepard (hereinafter "Gov't Defendants") for on brief these Government Defendants urge this Honorable Court to deem their anonymous and unsworn testimony of greater weigh – even of dispositive weight – in opposition to Plaintiff's particularized and sworn affidavit testimony. Such weighing is wholly improper at this stage of the proceedings. *See* argument, *infra.*

### c. Special considerations governing review given that the pro se litigant raises First Amendment claims

Given that the Plaintiff at bar is self represented and allegedly unworthy of admission to the elite corps of Indiana attorneys this Honorable Court must review  the Defendants' collective questioning of Plaintiff's pleadings against the deferential standard set forth *Kaba v. Stepp*, 458 F.3d 678 (7th Cir.2006):

> Pro se litigants are "entitled to have [their] complaint … liberally construed." *See Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir.2006). "It is, by now, axiomatic that district courts have a special responsibility to construe pro se complaints liberally and to allow ample opportunity for amending the complaint when it appears that by so doing the pro se litigant would be able to state a meritorious claim." *Donald v. Cook County Sheriff's Dept.,* 95 F.3d 548, 555 (7th Cir.1996).

*Kaba*, 458 F.3d at 684.

Furthermore, pleadings presenting allegations at the core of the First Amendment should be met with deferential review at this early stage in the ligation according to *Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004 (7th Cir.1990)

> This obligation is especially serious when, as here, we deal with allegations involving the freedom of expression protected by the first amendment. *See Stewart v. District of Columbia Armory Bd.*, 863 F.2d 1013, 1017-18 (D.C.Cir.1988) ("where government action is challenged on first amendment grounds, a court should be especially 'unwilling to decide the legal questions posed by the parties without a more thoroughly developed record of proceedings in which the parties have an opportunity to prove those disputed factual assertions upon which they rely' ") (*quoting City of Los Angeles v. Preferred Communications*, 476 U.S. 488, 494 (1986)).

3

*Id* at 1005. This case actually lies even beyond *Webster*, as that it alleges claims brought by a pro se litigant sounding under the First Amendment with ramifications on due process as well as discrimination and civil rights law. As such it advances claims beating at the very heart of our system of governance.

According to the Second Circuit Court of Appeals, allegations at the core of our constitutional form of governance should give a federal court great pause at this preliminary juncture in the litigation. When reviewing such pleadings under a Rule 12( c) motion it is advised that motions to dismiss be reviewed with "particular strictness" (rather the deference to the defendants), *see Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998). It is further advised that such a plaintiff be subjected to a pleading burden that is "very lenient, even deminimus." *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir.2003).

In conclusion, the applicable standards of review advise that this Honorable Court approach the Plaintiff's pleadings, with admissible evidence (*i.e.* attachments that could be admitted as exhibits) to the Defendants' motions included, and ask if the Plaintiff can demonstrate subject matter jurisdiction while presenting a theory that is at the least merely possibly true and one that would, if true, recommend at least some of the prayed for relief.

Because Plaintiff clears these low hurdles the Defendants should be ordered to complete the pleading stage by filing complete and responsive answers to the Plaintiff's verified complaint.

## II. Initial Matters Worthy of Comment

While the Court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law" *R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir.1989), the Court must likewise ignore opposing "facts" and "unripe" arguments asserted by the Defendants in a motion to dismiss.

The briefing filed by the Defendants tends to obfuscate the issues through the use of wholly improper straw men arguments and summary judgment-like posturing. Defendants present arguments

4

of the type expected after a period of full and fair discovery in a bid to escape from the nuisance of filing answers to Plaintiff's claims. While the burden falls upon the Plaintiff to respond to all but the most frivolous of these arguments, the following "big picture" points are intended to further advance judicial economy by revealing much of Defendant's briefing as unavailing at best.

### a. Plaintiff did not name the Board of Law Examiners in this action

This did not keep the Defendants from citing to a plethora of cases in which a disappointed bar applicant attempted to sue the Board of Law Examiners in federal court rather than appealing his decision to the United States Supreme Court. Since any and all such cases are inapposite procedurally, they are inapplicable to an argument for dismissal of this action.

### b. Plaintiff has sought relief against government actors in their personal capacity in this action.

The Defendants have crafted dispositive arguments assuming that the Plaintiff either sued only the state or sued only state officials in their official capacity. The Defendants have largely failed to brief the actual controversy at bar, that being the allegation of a civil rights conspiracy (*i.e.* bad faith) to violate constitutional rights (*i.e.* official "torts) involving government agents and their assigns (*i.e.*, private actors cloaked with the color of law) who are protected, by statute, by only "good faith" immunity (*i.e.*, subjective intent is relevant). All Defendants seem to miss the upshot of this theory of the case and argue that they have license to violate the constitutional rights of those hapless citizens remanded into their "Judges and Lawyers Assistance Program" due to immunities and/or abstention doctrines that effectively set them up well above the law binding upon police officers and other public servants given good faith immunity.

### c. Plaintiff seeks mostly equitable and declaratory relief in this public interest action.

The Defendants' arguments assume, in the main, that Plaintiff is seeking monies from the state treasury in the present action. Such is not the case since such a case simply cannot be made. This fact alone renders many pages of the briefing at bar completely inapposite to the issues at bar.

5

**d. Plaintiff presents a facial challenge in this action.**

Plaintiff challenges enacted law in this action, which explains why the Chief Judge of the Indiana Supreme Court is named in this action. Such facial challenges are neither rare nor routinely dismissed on motions such as those at bar.

**e. The Office of Attorney General has not been named as conspirators in this action and is not alleged to be witnesses in this action.**

Despite this fact, Attorney General Gregory F. Zoeller, by and through counsel Laura L. Bowker and/or Betsy Isenberg, testify as to the facts of the case and subjective intent of the alleged conspirators throughout the government's motion to dismiss. Rather than mere occasional lapses, this hearsay testimony, which is not tendered under oath or in any form cognizable as an affidavit, is found throughout the government's briefing and seems to betray a lack of insight into the federal rules as to the tendering of testimonial evidence. (Additionally, the testimony adduced presents arguments sounding under a summary judgment standard rather than motion to dismiss standard.) While demonstrating a lack of understanding of the applicable (and unstated on brief) standard of review, defense counsel has interjected much potential error into the record via this wholly improper pleading practice and Plaintiff must therefore seek a curative instruction from the Court.

The Office of the Attorney General seeks to move the Court to dismiss Plaintiff's case in response to the following unsworn, hearsay-laden propositions (all of which Plaintiff refuses to stipulate to and all of which Plaintiff hopes to explore in discovery):

> **"Justice Shepard was not involved in the decision by the Board of Law Examiners to refer Plaintiff to JLAP."** Memorandum … on Behalf of Chief Justice Shepard, Terry Harrell and Tim Sudrovech at pp. 11-12 (hereinafter "Gov't Dismiss Memo.")
>
> **"JLAP was not asked to, nor did it apply any sort of religious litmus test in assessing Brown's mental health. JLAP merely did as requested."** Gov't Dismiss Memo at p.14.
>
> **"[Defendants did not inquire into Brown's] religious beliefs other than to the extent necessary to explore his many arrests in connection with his pro-life**

**activities. They in no way discouraged Brown's practice of his faith or his beliefs. Their only concern was whether his arrests reflected badly on his character and fitness or whether his actions would interfere with his ability to practice law in a competent and professional manner."** Gov't Dismiss Memo, p.15.

**"[Brown avers that the mental health reports] mentioned his deeply held religious convictions. However, that was merely an observation and not a criticism."** Gov't Dismiss Memo, p.15

**"Presumably because of a long list of arrests and at least one conviction, the Board referred Brown to JLAP for review of his mental health as it might affect his ability to practice law."** Gov't Dismiss Memo, p. 22

**"Defendant Sudrovech had a legitimate reason for providing Defendant Bowman with information regarding the type of information that JLAP and the Board of Law Examiners requested."** Gov't Dismiss Memo, p. 29

**"Therefore, even if there was a 'valid business relationship' Defendant Sudrovech did not interfere with that relationship without justification."** Gov't Dismiss Memo, p. 29

All of the above testimony by defense counsel flies in the face of Plaintiff's sworn testimony. While the Defendants do not directly attack Plaintiff's evidence, their wholly improper tender of alleged eyewitness testimony seeking to controvert Plaintiff's sworn testimony does recommend the following:

> As we have said before, "[m]ost affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial." *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir.2005). *See Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir.2005) ("We have repeatedly stated that the record may include a so-called 'self-serving' affidavit provided that it is based on personal knowledge."); *Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir.2003). Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are "competent evidence to rebut [a] motion for summary judgment." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir.2004) ( per curiam).

*Kaba*, 458 F.3d at 681

Plaintiff's averments not only survive Defendants' pre-answer attack – they are well stated to survive scrutiny even under a summary judgment standard of review.

### III. Rebutting the Government Defendants' Arguments

Plaintiff, in the interest of judicial economy, builds his response on the framework supplied by the Defendants, beginning with the outline supplied by the Government, and then onto the motion filed by Defendant Dr. Ross and ending with Defendant Dr. Elizabeth Bowman's motion to dismiss. (Borrowed sections titles are placed in quotes.)

**"A. There is no case or controversy before this Court."**

The Government, throughout its pleading, demonstrates why the Plaintiff was insightful to not name the Board of Law Examiners in this matter. Not only is that entity unnamed, but the Plaintiff clearly alleges in paragraph 19 that "JLAP and the Board are distinct entities that do not share offices, mission statements, personnel or immunities."

Thus no case that has "Board of Law Examiners" in the title is on point with the merits animating the present action. Such cases are clearly inapposite by definition. Yet the Government argues from no fewer than six such cases on brief and the other Defendants follow suit.

The Government's use of *In Re Summer*, 325 U.S. 561 (1945) is representative. The Government argues from a case that was appealed out of the Illinois Supreme Court and onto the docket of the Supreme Court of the United States – thus *In Re Summer* did not arise out of an Article III court. Nevertheless, the Government argues that *Summer* somehow establishes that there is currently no case or controversy before this Honorable Court. The only thing that the *Summer* case holds in common with the present action is this: Mr. Summer was discriminated against due to his Christian convictions while communists were subsequently treated with greater deference. (See Gov't Brief at pp. 16- 17, acknowledging *that Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) stands for the proposition that the government "could not inquire into whether applicant participated in Communist party." *Id.* [sic].)[1]

---

[1]   It is illuminating to note that the upshot of *Baird* is not lost on the government defendants, for their argument that Brown has "no association interests" worthy of constitutional protection can only be interpreted as this: The Government Defendants stand prepared to justify processing Communists like Ms. Baird with far more deference as to their assumed intent to engage in the violent overthrow of our constitutional republic as an

8

Plaintiff alleges a conspiracy to discriminate against him through allegedly coerced mental health evaluations and fraud-laced opinions alleging that he lacks a sufficient dedication to "psychotherapy" due to his "personality disorder" -- which is revealed, through the application of standard axioms of logic, to be his religious beliefs. (No eligible associational interests there, claims the State.)  By arguing that such an allegation fails to state any constitutionally cognizable claim as a matter of law, the Government is reserving unto itself the right to undertake such discriminations in the future without fear of federal oversight and trot out the 65 year old, World War II era *Summer* case as their predicate to so discriminate.

It may be that the Government intended to put forth a viable Rule 12(b)(1) "no case or controversy" argument incident to Article III jurisdiction in section A of their brief, and merely got off on the wrong foot in the appeal to *In Re Summer*.  Assuming such to be the case given the heading of the Government brief, Plaintiff herein submits a standard Article III standing analysis:

According to *Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin*, 747 F.2d 407 (7th Cir.1984) the question of standing in the present setting is found to have a degree of mysticism mixed in:

> The difference between an abstract question calling for an advisory opinion and a ripe "case or controversy" is one of degree, not discernible by any precise test. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). Basically, the question in each case is whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Id.* at 298, 99 S.Ct. at 2308; *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 252 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982).

747 F.2d at 410-411.

---

outworking of their Party membership than Christians like Mr. Summer or the Plaintiff given their assumed belief in a Law higher than the State and association with Christian churches affirming the same.

Some would be tempted to count this as an admission against the State as to its readiness to engage in discrimination against Christians, since they cannot, according to the Gov't brief, assert a viable "right to join groups of associate with others of similar belief" *id.* at p.16 - unlike members of the Communist Party.

Using this test, even a cursory review of the pleadings at bar reveals the controversy to be substantial -- said substance being federal constitutional rights. The parties at bar clearly have adverse legal interests, for none can argue that they are in agreement on the rights inherent in religious beliefs, associational protections and State-mandated mental health inquisitions given the differing positions alleged in the verified complaint. There is immediacy and reality to the issue at bar since the Plaintiff alleges the recent violation of constitutional rights by government agents and their assigns – such timely allegations must be treated as "reality" by Article III courts – at least at this stage in the proceedings.

According to one of the leading experts on standing the doctrine is comprised of three constitutional requirements and three prudential requirements. Those constitutional requirements are:

> First, the plaintiff must allege that he or she has suffered or immediately will suffer an injury. Second, the plaintiff must allege that the injury is fairly traceable to the defendant's conduct. Third, the plaintiff must allege that a favorable federal court decision is likely to redress the injury.

Erwin Chemerinsky, FEDERAL JURISDICTION, 1994, § 2.3 *Justiciability*, § 2.3, p.57-58 (hereinafter "CHEMERINSKY")

Plaintiff shows the court the following (nonexhaustive listing) in response to these tests: Plaintiff's Injury: 17, 39, 55, 83, 138, 167, 206, 214-15,  Defendant's Conduct: 20, 39, 55, 82, 98, 127, 140, 166, 171-72,  178-80, 189, 197, 202-03, 205,  265  Redress: *See* Wherefores under each legal claim.

As to the prudential standing triple crown, Professor Chemerinsky states that a plaintiff must assert only his own rights, assert rights more defined than that common to all taxpayers and must fall within the zone of interest at issue in the litigation.    *Id.*  Put another way, to constitute an actual controversy "the disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effects its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Serv. Comm'n v.*

10

*Wycoff Co.,* 344 U.S. 237, 244 (1952). Plaintiff's pleadings clear this low bar, as is evidenced by Defendant Ross' argument that Plaintiff sets forth far too much as to detail, Defendants' obvious concerns about the effect of this litigation upon their conduct and Plaintiff's presentation of useful purposes found in his prayer for relief.

Ripeness and Mootness are two additional justiciability doctrines that this Honorable Court should consider at this stage of the proceedings. "While standing is concerned with who is a proper party to litigate at particular matter, ripeness and mootness determine when that litigation may occur." CHEMERINSKY § 2.4 *Ripeness*, pp. 113-14.

Ripeness has application in as much as Plaintiff asks the Court to consider a pre-enforcement challenge of state laws governing confidentiality. Plaintiff at bar alleges that he fears that he will be disciplined under confidentiality rules if he tells the full story of his "processing" at the hands of the Defendants, using all relevant (and currently subject to confidentiality rules) documents. As such, this case is much like *Steffel v. Thompson*, 415 U.S. 452 (1974). Plaintiff is caught between the "Scylla of intentionally flouting" the Rules of Confidentiality by publishing all matters incident to his processing through the JLAP system and the "Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed" a administrative proceedings in both Indiana and Kansas. *Id.,* 415 U.S. at 462. According to Chemerinsky, it is "well established that a case is ripe because of the substantial hardship to denying pre-enforcement review when a person is forced to choose between forgoing possibly lawful activity and risking substantial sanction. People should not be forced to exercise their rights at peril of ... loss of employment." CHEMERINSKY § 2.4, pp. 118-119.

This case is ripe for adjudication.

Mootness is "the doctrine of standing in a time frame" and if the standing hurdles are overcome then mootness is, at that time, satisfied. *United States Parole Comm. V. Geraghty*, 445 U.S. 388, 397 (1980).

11

A case is moot if there is no possible relief which the court could order that would benefit the party seeking it. *Church of Scientology v. United States*, [] 113 S.Ct. 447, 449(1992) []. The appeal in this case is not moot in that sense. At least partial relief is possible, and that is enough to satisfy the requirements of Article III. *Id.*, 113 S.Ct. at 450; *In re UNR Industries, Inc.*, 20 F.3d 766, 768 (7th Cir.1994).

*In Re Evirodyne Industries, Inc.*, 29 F.3d 301, 303-04 (7th Cir.1994) Mootness is not an issue at bar. If the Court granted Plaintiff's prayers then a harm would be removed.

The final question as to justiciability that the Court should entertain at this time is the Political Question Doctrine. This argument is, at bottom, that the federal district courts should simply look away when some violations of the Federal Constitution are alleged due to entanglements with other branches of governance. Defendants at bar seemingly invoke this doctrine when hiding behind the Board of Law Examiners for cover.

It is fair, according to Professor Markin Redish, to dub this doctrine more akin to an unsolvable puzzle than a legal standard: "The doctrine has always proven to be an enigma to commentators. Not only have they disagreed about its wisdom and validity ..., but they also have differed significantly over the doctrine's scope and rationale." REDISH, JUDICIAL REVIEW AND THE 'POLITICAL QUESTION' 79 NW.U.L. REV. 1031 (1985). Plaintiff could locate no case on all fours with the present facts in which this doctrine was invoked, and given that this is a case brought under 42 USC § 1983 Plaintiff argues that this doctrine should not be invoked in this instance:

> The general rule is that, where it appears from the [complaint] that the right to relief depends upon the ... application of the Constitutional or laws of the United States that that such federal claim in not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction."

*Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921)'

Finally, it must be noted that Plaintiff has sought relief under, inter alia, the Declaratory Judgment Act. The Government seems to be arguing on brief that the Plaintiff is seeking a merely advisory opinion.

If that is the Government's argument, then case law and the above analysis assures all that such

is not the case at bar:

> [w]here there is such a concrete case admitting of an immediate and definitive
> determination of the legal rights of the parties in an adversary proceeding upon the facts
> alleged, the judicial function may be appropriately exercised although the adjudication
> of the rights of the litigants may not require the award of process or the payment of
> damages.

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937).[2]

At bottom, Plaintiff brings to the court an allegation that his federal constitutional rights have

been violated by government actors (and their alleged agents) who are duty-bound to obey the United

States Constitution.   Plaintiff thus brings to the docket an actual dispute within the jurisdiction of this

Honorable Court.  The hoped-for change arising in the wake of this public interest litigation will aid all

future Indiana bar applicants, including the Plaintiff himself.

**"B.  This suit is barred by the Rooker-Feldman doctrine."**

The analysis in *Mitchell v. Fishbein*, 377 F.3d 157 (2d Cir. 2004) is on all fours with the

present controversy and should put an end to consideration of Rooker-Feldman given the facts at bar.

> While the Rooker-Feldman doctrine recognizes that the federal district courts may not
> review decisions by a state's courts, it does not preclude federal district court review of
> 'executive action, including determinations made by a state administrative agency.'

*Id. citing Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635, 644 n. 3, (2002)

The *Fishbein* Court hastened to add that "This principle holds true even where the

administrative agency acted in an adjudicative capacity." *Id.*

The "administrative agency" at bar is JLAP and it did not act in an adjudicative capacity under

the facts at bar.  Furthermore, the conspiracy allegations at bar are not against JLAP *qua* JLAP, but

rather against the executive administrators of JLAP, in their individual capacities, and those who are

---

[2] According to Chemerinsky, "federal courts can issue declaratory judgments if there is an actual dispute
between adverse litigants and if there is a substantial likelihood that the favorable federal court decision will
bring about some change." *Id.* 2.3, p. 53.  Such is the law, the rule from *In Re Summer* notwithstanding.

13

alleged to have worked with those government agents in the allegedly unlawful goal of violating Plaintiff's rights.

Defendants can show no facts at bar supporting the allegation that their acts were, at best, anything other that those of an administrative agency. Claims of judicial-like authority are lacking against the affidavit at bar, which alleges no judicial like review. Calling oneself judgelike does not result in judgelike immunities (anymore that calling oneself godlike results in omnipotence.) *Fishbein* analysis, which was set down before the doctrine was significantly narrowed by the Supreme Court the year following, takes Rooker-Feldman abstention off the table under the facts at bar.

In the year following the *Fishbein* ruling, the United States Supreme Court endeavored to clarify the Rooker-Feldman doctrine's contours because it had been "[v]ariously interpreted in the lower courts." *Exxon Mobil Corp., v. Saudi Basic Indus. Corp.*, 125 S.Ct. 1517, 1521(2005). The Court held that the Rooker-Feldman doctrine "is confined to cases of the kind from which the doctrine acquired its name," those being (1) cases brought by state-court losers who are (2) complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and (3) cases inviting district court review and rejection of those judgments. *Id.* at 1521-22.

Under this test the current litigation certainly does not fall to the Rooker-Feldman doctrine, for:

(1) Plaintiff is not a state-court loser. There was no previous case or controversy in the state court where Defendants Harrell, Sudrovech, Ross or Bowman stood in the dock opposite Plaintiff. Nor has the herein pled conspiracy ever been either pled or adjudicated, and;

(2) Plaintiff does not complain of injuries visited upon him by another court. Plaintiff nowhere pleads the actual denial of his certification as to character and fitness as a damage. Plaintiff rather complains of unconstitutional discrimination and torts (*i.e.*, billing fraud and deception in contracting) visited upon him while he was processed through a state system that claims autonomy from the absolutely immune Indiana Board of Law Examiners. (Indeed, plaintiff could have, and states that he

14

would have, brought this litigation even had he been granted certification by the Board of Law Examiners), and finally;

(3)   Plaintiff does not invite the district court to either review or reject the Indiana Supreme Court's final conclusion as to his bar-worthiness, for that conclusion is simply irrelevant to the current action.

The *Exxon Mobil* Court further explained that Rooker-Feldman does not "stop ... district court[s] from exercising subject-matter jurisdiction [simply] because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* at 1527. Indeed, using the Defendant's analysis the Plaintiff would be barred from bringing suit against the mental health agents sued herein even if they had improperly reported him to government agencies as one who is mentally ill (as evidenced by his holding of deranged and dangerous religious views) after first subjecting him to Bush-era water boarding.

Such an absolutely immunizing analysis must give way to a more reasonable review of the Rooker-Feldman doctrine in light of the claims at bar.

Our Highest Court turned to the Seventh Circuit's opinion in *GASH Associates v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir.1993) to demonstrate a  reasonable analysis under Rooker-Feldman, stating that "[i]f a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ...., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." ' Id.

Given this rule this Honorable Court enjoys jurisdiction. Plaintiff alleges that the State of Indiana's eventual ruling as his bar application (whatever that may be) will have no effect upon the instant litigation – but even if it is assumed that he disagrees with the Board of Law Examiner's report that is allegedly based, in part, upon the reports of Defendants Harrell, Sudrovech, Ross and Bowman, and even if it is assumed that the Board's final report informed the Indiana Supreme Court in its not-yet-

15

final, fact-free and law-free denial of Plaintiff's petition to join the bar, even with those assumptions in place, this action is merely the Plaintiff at bar denying (but not seeking review of) a legal conclusion of the Indiana Supreme Court while serving up independent claims against the named Defendants, none of whom are shown to have communicated with the Indiana Supreme Court and none of whom are on or employed by the Indiana Board of Law Examiners.

No Rooker-Feldman abstention is called for under such facts, for, as Defendant Ross admits on brief, the "pivotal inquiry is 'whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting independent claims.'" *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 555 (7th Cir.1999)(*citing Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 510 (7th Cir.1996)).

In this action the Plaintiff presents independent claims while, it could be extrapolated, denying a legal conclusion that a state court has reached in a case to which he (but none of the Defendants at bar) was a party. Defendants can field no argument that the claims presented in the instant litigation are subject to a viable preclusion argument. Indeed, in their more than seventy pages of briefing the Defendants present not one preclusion argument.

Only if the Plaintiff at bar sought to set aside a state judgment would Rooker-Feldman bar the federal district court's jurisdiction. *See GASH Assocs.*, 995 F.2d at 728; *see also Centres, Inc. v. Town of Brookfield*, 148 F.3d 669, 702-03 (7th Cir.1998) (noting that "a federal claim alleging injury caused by a state court judgment must be distinguished from a federal claim alleging a prior injury that a state court failed to remedy," for "[i]njury due to a state court decision [is] the essential touchstone in determining the applicability of the Rooker-Feldman doctrine.").

Plaintiff clearly alleges injury whose causation is independent of, and prior to, the November, 2009 order of the Indiana Supreme Court which is now the subject of a Petition for Writ of Certiorari.

It is beyond cavil that *Centres* and *Long* pivot the guns of Rooker-Feldman away from the instant docket. Plaintiff at bar's federal claim alleges injuries and seeks remedies that were simply not presented to or argued before the state court. One cannot be a "loser" in a fight that one has never

16

waged. Plaintiff does not ask this Honorable Court to undo the loss that he suffered, that is, does not ask this Honorable Court to reverse the decision of the Indiana Supreme Court as to his licensure in the Hoosier State. He merely asks this Honorable Court to rule on the propriety of the actions of JLAP's management and their hand-picked agents, independent of the eventual disposition of his case yet pending before Indiana's High Court.

The final touchstone for Rooker-Feldman analysis is found in the remedies sought. The Sixth Circuit has instructed that courts "must pay close attention to the relief sought by the federal-court plaintiff." *Hood v. Keller*, 341 F.3d 593, 597 (6 th Cir.2003) (citations omitted). Defendants' briefing fails to analyze this crucial question. Does the Plaintiff seek a *de facto* appeal of a state court judgment or does the Plaintiff seek relief that would leave the state court judgment standing? Does the Plaintiff seek "a remand so the district court may determine whether the Committee violated [federal law]", as did Ms. Edwards in the case that Defendant Ross labels as a "mirror" to the present fact? *Edwards v. Ill. Bd. Of Admissions*, 261 F.3d 723 (7th Cir. 2001), argued as dispositive at Ross, pp. 12 – 13.

Plaintiff does not seek such relief or remand. Like the *Gash* plaintiff, disappointed bar applicant Edwards sued the "wrong party" while seeking the "wrong relief" to escape Rooker-Feldman's triple pronged analysis. Edwards struck out of all three of those prongs – Plaintiff at bar strikes out on none of them. Even if this Honorable Court granted Plaintiff everything that he prays for – he would still be unadmitted to the Indiana roll of attorneys and still be barred from again seeking admission until five years had run – or at least until he converted to a religion that advances no claims higher than the State.

Rooker-Feldman abstention simply does not apply in the present setting.

Defendants' argument that Rooker-Feldman applies tangentially, that is, by way of the alleged intertwining of Plaintiff's complaint with the bar admission decision is likewise in error.

*Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006) is illustrative of how the new and clarified Rooker Feldman doctrine is to be analyzed in a licensure format. Dr. Guttman was yet being subjected

17

to state licensure processing (designed to revoke his license to practice medicine) in state court when he filed in the federal district court. The district court dismissed the action pursuant to a summary judgment motion under Rooker Feldman, just as the Defendants at bar demand.

The Tenth Circuit Court of Appeals affirmed the district court's Rooker-Feldman based dismissal. *Guttman v. Khalsa*, 401 F.3d 1170 (10th Cir.2005). That decision was vacated by the Supreme Court in the wake of *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), and the remanded by *Guttman v. Khalsa*, 546 U.S. 801 (2005).

Upon remand the Tenth Circuit Court of Appeals ruled as follows:

> In *Exxon Mobil,* the Supreme Court reversed a Third Circuit decision holding that a federal court lacked subject matter jurisdiction when a state and federal suit were filed concurrently and the state court ruled first. *Exxon Mobil,* 125 S.Ct. at 1525-26. In so doing, the Court *reduced the scope* of the Rooker-Feldman doctrine to the *narrow set of cases* out of which it was born. "The Rooker-Feldman doctrine ... is *confined to cases* of the kind from which the doctrine acquired its name: cases brought by *state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.*" *Id.* at 1522-23.

446 F.3d at 1032 (emphasis added). Dr. Guttman had named the very parties involved in his state court action and sought to have that state court action reviewed while yet on appeal. Despite this close connection between his state court and federal court action, Dr. Guttman's case did not fall under the post-*Exxon* understanding of the Rooker-Feldman doctrine.

The case at bar is likewise yet on appeal. Furthermore it involves parties never before paired in litigation and specifically asks the Court to NOT review a judgment of the Indiana Supreme Court or any claim that was adjudicated by that Court. Rooker-Feldman is likewise inapplicable to the case at bar .

Defendants' collective arguments as to the "intertwining" effect of Rooker-Feldman is also undone by the Fourth Circuit's decision post-*Exxon Mobil* decision in *Washington v. Wilmore,* 407 F.3d 274 (4th Cir.2006). In that action a pardoned criminal defendant brought an §1983 action against city and police officers, alleging, *inter alia*, due process violations arising out of the use of fraudulent

evidence. Rooker-Feldman was raised in defense. Washington's litigation claimed that Wilmore "falsely reported to the prosecutor that Washington possessed nonpublic information about the crime" much as the instant litigation claims fraud in the reporting of Drs. Ross and Bowman as well as Sudrovech. The Fourth Circuit found no record "that [the] issue regarding Wilmore's truthfulness on this point was raised at trial" despite finding evidence that "Washington's counsel did probe certain aspects of Wilmore's account of Washington's confession." *Id.* at 280.

Despite this close nexus, the Washington Court concluded that "Wilmore's truthfulness on this point was not inextricably intertwined with the issues presented to the state court during Washington's criminal trial." *Id.* The nexus alleged at bar is nothing close to this. There is no evidence to even suggest that the Indiana Supreme Court considered Plaintiff's concerns regarding Drs. Bowman, Ross, Sudrovech or Harrell, for none of these Defendants are mentioned in the Court's one page, fact-free and law-free order.

The test that the Washington Court used to weigh Rooker-Feldman intertwining caused it to ask "whether a federal court finding that Wilmore was untruthful regarding Washington's independent knowledge of the shirt would have the effect of undoing Washington's criminal conviction for the murder of Rebecca Williams." Since the answer to this question was "it would not" Rooker-Feldman intertwining was not applicable. *Id.*

The question at bar should be whether a federal court finding that the Defendants at bar conspired to violate Plaintiff's constitutional rights would have the effect of undoing the Indiana Supreme Court's (two steps removed) acceptance of the Indiana Board of Law Examiners' (one step removed) refusal to certify Plaintiff as to good moral character and/or mental fitness (the record is less than clear). The correct answer to this question is "it would not."[3]

---

[3] It could be argued that by winning this case Plaintiff would only further prove to the Indiana authorities that the religiously-motivated, constitutionally-informed political dissident at bar is simply unworthy of licensure in the State of Indiana, as that he lacks the insight to perceive that one simply must not question the government.

19

The Fourth Circuit deemed important that "Washington challenges not his conviction but rather one aspect of the means by which that conviction was achieved," thus recommending citation to *Jordahl v. Democratic Party of Va.,* 122 F.3d 192, 202 (4th Cir.1997), which "distinguish[ed] between 'actions seeking review of the state court decisions themselves and those cases challenging the constitutionality of the process by which the state court decisions resulted.'" Id. "Put differently, Washington's claim of injury rests not on the state court judgment itself, but rather on the alleged violation of his constitutional rights by Wilmore." 407 F.3d 280.

Parallels to the instant litigation abound: Plaintiff's claim of injury rests not on the denial of his character and fitness by the Indiana Supreme Court but rather upon alleged violations of his constitutional rights by the individually named Defendants while they "processed" him through an allegedly anti-religious system euphemistically dubbed the Judges and Lawyers Assistance Program.

The Fourth Circuit also found the following dispositive: "there is simply no mechanism by which Washington could have obtained from the state court a resolution of the question of Wilmore's truthfulness ... [as that the tribunal he stood before was limited to] the question of a defendant's guilt or innocence" and was not charged to "make particularized findings regarding the credibility of individual witnesses generally or with respect to a specific item of testimony." *Id.* at 280-81.

In the same way neither the Indiana Board of Law Examiners nor the Indiana Supreme Court were charged or equipped with the tools to determine if the Defendants at bar were involved in a conspiracy to deny Plaintiff's federal constitutional rights. The Defendants' testimony was neither taken nor weighed in an adversarial setting. Defendants' testimony was not even submitted under oath and was certainly not subjected to cross examination. (Indeed, the mere questioning of their opinions was regarded as evidence of a lack of good character.) Most of the accruements of modern due process (at least since Star Chamber) were lacking in the JLAP program and all built upon JLAP's inquisition. Thus the *Washington* Court would likewise find "simply no mechanism by which [Brown] could have

obtained from the state court a resolution of the question of [Defendants' lack of fraudulent intent and acts]."

For all of the aforementioned reasons there is no showing of Rooker-Feldman intertwining at bar.

### "C. Plaintiff's claims are barred because of Eleventh Amendment immunity."

All Defendants raise this unavailing Eleventh Amendment of the Constitution of the United States based argument. This defense would have some force if Plaintiff had named the Board of Law Examiners or even the Judges and Lawyer Assistance Program in the caption. Or if the Plaintiff sought a monetary judgment from the state coffers adequate to reimburse him for the now more than three years that the State of Indiana, though the Board of Law Examiners, has held off his admission to the state bar. Plaintiff did not so open his suit to such a claim, for he is estopped from so doing by the Eleventh Amendment. His damages at the hands of the Board of Law Examiners are, for the most part, without remedy in this world -- due, in the main, to doctrines formulated in the age of the divine right of kings and state sponsored religious inquisitions.

It is crucial for the Eleventh Amendment analysis to note that Plaintiff names only the individual officers in this litigation. This play constitutes a legitimate "end run" around the Eleventh Circuit according to one of the leading commentators on federal justiciability: "The Eleventh Amendment [can] be circumvented by naming a state officer as defendant instead of the state government itself. This principle actually was derived from English common law where the King had sovereign immunity, but other officials could be sued to remedy wrongs done by the government." CHEMERINSKY, § 7.5 *Ways Around the Eleventh Amendment: Suits Against Officers*.

The Black Letter law is spelled out in WRIGHT & MILLER, THE FEDERAL JUDICIAL SYSTEM, THE JUDICIAL POWER OF THE UNITED STATES, OVERALL CONCEPTS:

> Suits against individual officers may be barred by the Eleventh Amendment. The inquiry, as it is with agencies and agencies and political subdivisions, is whether the *state is actually the real party in interest*. Thus, in the Ford Motor Company case, ...

21

the Court dismissed an action in which Indiana law permitted a taxpayer to sue the Department of Treasury and its individual officers to obtain a refund of taxes illegally exacted. Because payment of a judgment against the individuals clearly was to come from *the state treasury*, the action was essentially one against the state, and thus was barred.

> On the other hand, *if the officer will be personally liable, the Eleventh Amendment will not bar the suit.* In other words, the fact that a defendant holds public office does not make him immune from personal liability for damages, ... for example, for depriving a plaintiff of federally-protected rights under color of state law. ... In *Scheuer v. Rhodes,...* personal representatives of students killed by National Guardsmen at Kent State University sued the Governor of Ohio and other individual officers. *The Supreme Court held that the Eleventh Amendment does not bar an attempt to impose individual and personal liability on state officials for a deprivation of rights under the color of state law.* It is possible that such a defendant might be able to avail himself of some other basis for immunity, ... but he does not partake of the state's sovereign immunity. When the complaint fails to specify whether the suit is against the state officer in his official or personal capacity, the Court will infer the character of the action from "the course of the proceedings."

*Id., c. SOVEREIGN IMMUNITY AND THE ELEVENTH AMENDMENT(emphasis added)*

The Eleventh Amendment argument is inapposite in the face of litigation such as that at bar, for "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from the unconstitutional action under color of state law, whether that action be executive, legislative or judicial." *Mitchum v. Foster,* 407 U.S. 225, 242 (1972).

The Eleventh Amendment merely bans any and all monetary damages claims that Plaintiff makes against state officials acting in their official capacity. Plaintiff seeks no such damages.

### "D. Defendants are not 'persons' under 42 U.S.C. § 1983"

The Government is found disagreeing with its own analysis when advancing the Eleventh Amendment and "not persons" arguments given the allegations at bar, for according to the Indiana Supreme Court

> It is now well established that section 1983 creates "a species of tort liability" in favor of persons deprived of their federal constitutional rights. *See Carey v. Piphus,* 435 U.S. 247, 253 [] (1978) (*quoting Imbler v. Pachtman,* 424 U.S. 409, 417 [] (1976)). Section 1983 permits recovery against individual officers and units of local government, but not against the State itself. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71,

22

> 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (Neither states, nor state officials acting in their
> official capacities, are "persons" susceptible to damage suits under section 1983. This
> precludes a suit in state court against a State for damages under section 1983);
> *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, [](1984) (States are
> immune from suit under section 1983 in federal court because of the Eleventh
> Amendment).

*Cantrell v. Morris*, 849 N.E.2d 488, 506 (Ind.2006)(emphasis added).  As argued in the previous

section, claims brought against Defendants Sudrovech, Harrell and Shepard in their official capacity

are claims brought against their offices.  Claims brought against them in their individual capacities are

claims brought against them as persons.  Except for Defendant Shepard, both claims are present at bar.

Only the "individual capacity" claims can result in monetized damages.  The nonjudicial Defendants at

bar are indeed persons under 42 USC § 1983.

## "E.  Defendants are not liable because they had no personal involvement in the activities about which Plaintiff complains."

The Government Defendants misread the record when stating that "As to Harrell and Sudrovech,

Brown does not allege that they were personally involved in any alleged discrimination."  Gov't

Memo, p.12.  Even a cursory reading of the Complaint should clear up any confusion on that front. The

Government further sets up a straw man in arguing that "There are no allegations that Sudrovech and

Harrell *dictated* the contents of the reports completed by Defendants Ross and Bowman."  p. 12 (emp

added)  Such is not the Plaintiff's burden to either allege or prove -- now or at anytime on the road to

prevailing in this litigation.

As the government admits on the page preceding the above-referenced misstatements of fact and

law, the plaintiff needs only allege that a Defendant (1) "directed the conduct causing the constitutional

violation," or (2) "[the alleged violation] "occurred with [Defendant's] knowledge," or (3)  "[the

alleged violation] "occurred with [Defendant's] consent." *Sansville v. McCaughtry*, 266 F.3d 724, 740

(7th Cir.2001).  Dictation needs not apply.

Given this threshold these paragraphs from the Complaint more than meet the pleading burden and

show the Government's argument as unavailing. *See* for "directed:"  74, 82-83, 85, 89-90, 109-110,

118, 122, 127, 166   *See* for "knowledge:"   ¶ 20,  92-93, 189 (and directed)  *See* for "consent:"   ¶ 47, 55, 151, 195 – 205.

More could be cited for both Sudrovech and Harrell, but these cites more than suffice to inform the Court as to the nonviability of the Government's "no personal involvement" argument as to Defendants Sudrovech and Harrell.

Defendant Shepard (who is named merely as a representative of the Indiana Supreme Court) is not at this time subject to allegations of personal malfeasance.  If such allegations are later to be found evident and of a sufficient nature to overcome absolute immunity then he would then be pled into this matter as a Doe Defendant in his individual capacity.

## "F.  Plaintiff's claims fail when analyzed under the requirements necessary for claims under the First Amendment."

Defendants attempt to run well ahead of the 12(b)(6) standard of review at this point in the proceedings and file, in essence, a summary judgment motion and memorandum that argues out of the unsworn and even anonymous testimony of government attorneys.  (While Plaintiff is familiar with this litigation tactic due to his previous experience with government attorneys in the State of Indiana, he believes it to be wholly improper and thus objects.)

Rather than rushing headlong into the squeezing of *Lemons* or burning of *Barnettes* at this early stage of the litigation, Plaintiff advises that the following analysis be undertaken as to the First Amendment and other constitutional claims:

> Liability under § 1983 requires proof of two essential elements: that the conduct complained of (1) was committed by a person acting under color of state law; and (2) deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Larsen v. City of Beloit*, 130 F.3d 1278, 1282 (7th Cir.1997).

The question at bar is thus whether Plaintiff is credibly alleging the predicate for making such showings of proof at a later (post answer and discovery) stage of these proceedings. He does, for: (1) Defendants Sudrovech and Harrell are state agents with whom Defendants Ross, Bowman and Does

allegedly colluded and conspired, *see infra,* and; (2) Plaintiff alleges that this conspiracy violated his constitutional rights secured by the First and Fourteenth Amendments. See legal claims at bar.

Plaintiff cites to the following allegations, which, if true, would constitute an abridgment of his First Amendment rights by Defendants Sudrovech and Harrell: ¶¶ 74, 85, 92, 94, 103, 151, 189, 197-98, 200-01, 265. Plaintiff clearly alleges a free exercise restraint at ¶¶ 85, 170, 195. Plaintiff submits the following as more than sufficient predicate for eligibility under a "right of association" analysis:

> 153. Dr. Bowman informed Plaintiff that he placed his values and morals higher than legal obligations and by so doing shared much in common with early church, including being at odds with the state. That Plaintiff's conservative political and Roman Catholic views were the primary focus of Dr. Bowman's interviews are evident throughout Dr. Bowman's final report and are used to support her conclusion that Plaintiff suffered from Personality Disorder, Not Otherwise Specified.
>
> 154. Dr. Bowman's report stated that:
>
> "Like many people of faith of past millennia, he firmly believes he is obligated as a Christian to put obedience to God's laws above human laws." Id.; "He considers his [former protest activities] an integral part of his Roman Catholic Christian faith and considers his actions morally right." Bowman report at p.4;
>
> 189. All of this was brought to the attention of the Defendants Sudrovech and Harrell, as well as all other government agents involved in the review of Plaintiffs application, No action was taken to redress the harm arising from these seeming biases. Upon information and belief the refusal to remedy the effect of such prejudices and intolerances is evidence of animus and invidious, discriminatory intent raised against Plaintiff due to his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.
>
> 197. Defendant Sudrovech noted that Dr. Bowman's report was based, in large part, upon Plaintiff's "lack of empathy" regarding "issues associated with his beliefs." Defendant Sudrovech did not point out to the Board that those beliefs were at the core of the First Amendment's zone of protection.
>
> 198. Defendant Sudrovech noted that Defendant Bowman credited Plaintiff's "personality disorder" as the source of his "civil disobedience." Defendant Sudrovech failed to quote the sections of the Bowman report that stated that Plaintiff "clearly has moral integrity, which has consumed his life and led, at times, to principled civil disobedience." and "He has moral integrity [which has been] expressed in a manner that has led to principled civil disobedience based on his religious beliefs."

25

199. Simple logic thus reveals that the Bowman report equates Plaintiff's religious beliefs with Plaintiff's "personality disorder."   Defendant Sudrovech's report obfuscated, rather than revealed, this simple logic.

200. Defendant Sudrovech, MA, LCSW, then took upon himself the role of diagnostician, writing that "JLAP agrees to some degree with Dr. Bowman's conclusion 'that Mr. Brown's success would be enhanced by individual psychotherapy,' as anyone who would actively involve themselves in a therapeutic process would."  Going deeper into the practice of the psychiatric arts, Defendant Sudrovech then opined, "However JLAP questions how much Mr. Brown would value the experience of psychotherapy, how appropriately engaged in a therapeutic process he would be." (Emp. in original)

265. Upon information and belief all of the foregoing alleges that Plaintiff was the subject of a conspiracy to fail him through the JLAP process by Defendants and others, including the Doe Defendants, acting in collusion and out of biases, invidious discriminatory intent and animus causing them to target him because of his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

It is instructive, given Plaintiff's prayer for sensitivity training as relief, to note that while the Government admits on brief that it simply cannot "inquire into whether applicant participated in [the] Communist Party," Gov't brief at pp. 16-17,  the Government brazenly argues, after taking note of the above, that Plaintiff "identifies no association eligible for protection by the Constitution."  Memo, p. 17.[4]

Evidently the State of Indiana is ready and willing to accept Communist Party activities and deeply held dialectical materialistic beliefs as protected interests under rights of association, but neither of the following from the complaint:  "[P]ro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective" *Id.* at ¶ 265 nor "conscience objections [based upon] Catholic faith and conservative, constitutional perspective[s]."  *Id.* at ¶ 96.  Not only that, but none of these associations recognized in the Government brief are considered

---

[4]  In keeping with this shockingly low regard for religious association, the Government attorney testifies on brief that Plaintiff simply had to be probed incident to his "pro-life activities" and "deeply held religious convictions" to since his history in the pro-life movement "reflected badly on his character and fitness" and thus raised the question of  "whether his [pro-life] actions [of fifteen years prior] would interfere with his ability to practice law in a competent and professional manner."  Memo, p. 15.

26

eligible for protection under the First Amendment: "[P]ro-life activities," "practice of faith or ... religious beliefs," "deeply held religious convictions." Gov't Brief at pp. 16 -17.

It appears that the Indiana judiciary is more than prepared to allow card carrying communists the robust exercise of rights to associate without punishment or even a mild inquisition – it is just conservatives, constitutionalists, Catholics or pro-life Christians -- and certainly those who hit on all four (*i.e.,* those who present in a manner moving Defendant Bowman to reject Drs. Ross, Sass, Alexy and Flueckigers' conclusions and instead label Plaintiff as "Personal Disorder, Not Otherwise Specified" -- a.k.a. "too serious about his religion to entrust with a law license") who must be racked and interrogated (metaphorically and psychiatrically speaking, that is).

Incident to its summary judgment-like defense of the Free Exercise claim the Government asks the Court to "take notice of the fact that the MMPI-2 is a widely used and accepted psychological test." Gov't Memo, p. 15. Such arguments from populism do little to advance constitutional governance. Poll taxes were once common, as were segregated drinking fountains, the criminalization of abortion and white-male-only state bars. Did that render them constitutional? Furthermore, if the Court is to take judicial notice of anything regarding the MMPI-2 and the free exercise of religion it should be footnote 43 to the Harvard Journal of Law and Public Policy's article RELIGION, THE PUBLIC SQUARE, AND THE PRESIDENCY by Eric Treene:

> Job applicants with certain religious indicia on their resumes are suspect [FN42]-- indeed personality tests such as the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and California Psychological Inventory (CPI) have flagged the deeply religious as psychologically unqualified. [FN43] Similarly, applicants for elite educational opportunities often need to tone down or hide their religious feelings to improve their chances for admittance. [FN44]
>
> [FN43]. See Bennett v. County of Suffolk, 30 F. Supp. 2d 353 (E.D.N.Y. 1998) (holding that genuine issues of material fact existed as to whether certain questions employed by the MMPI and CPI, including "I believe in a life hereafter" and "I feel sure that there is only one true religion," were proper); see also Sarah E. Hinlicky, Seminary Sanity, First Things, Aug./Sept. 2000, at 14, 15 (recounting incident of seminary candidate who was alarmed at high score on MMPI for "Bizarre Mentation," and was assured by the psychologist that "[a]ll religious people score high on that one"

based on positive responses to statements like "I believe there is an afterlife" or "I think angels exist.").

According to *Bennett v. County of Suffolk*, 30 F. Supp. 2d 353 (E.D.N.Y. 1998), the standard

psychological interrogation often includes these questions, among others:

> I believe in a life hereafter.
> I believe my sins are unpardonable.
> I deserve severe punishment for my sins.
> I have never seen a vision.
> My thoughts these days turn more and more to death and the life hereafter.
> The man should be the head of the family.
> I feel sure that there is only one true religion.
> I have no patience with people who believe there is only one true religion.
> I have never seen a vision.

*Id.* at 355. Subsequent to his postmodern inquisition, Mr. Bennett file suit claiming that

> the questions cited above and contained in both the MMPI-2 and the CPI are of a religious nature and are not necessary to evaluate an applicant for a law enforcement position. In addition, the plaintiff claims that as a result of his answers to these religious questions he was denied a position with the Suffolk County Police Department and was thus discriminated against on the basis of his religious beliefs in violation of the First Amendment and Title VII.

*Id.* In the face of this evidence the government defendant, no doubt as advised by its

mental health inquisitors, argued that

> the questions posed to the plaintiff were of a non-religious nature and were not intended to be used as a means of discriminating against individuals based upon their religion. In addition, the defendants' contend that the plaintiff failed to adduce any evidence that any of his answers to any of the questions on the MMPI-2 and the CPI played a role in the decision finding him not qualified.

*Id.*

The trial court found a material issue of fact as to the religious nature and propriety of the

questioning and thus denied summary judgment motions from both parties as to the nature of the

psychological questions. *Id.* at 356. In the present instance the denial should be of all pending motions

to dismiss. Such a ruling would then allow the Plaintiff opportunity to continue to develop his theory

of the case, which bears striking similarity to Mr. Bennett's theory.

**"G1.   Admission and Discipline Rules 2, 19 and 23 have no relevance or application to these Defendants."**

The Government Defendants seem to understand that Plaintiff is mounting a facial challenge to Rules governing the licensure and discipline. As the Government further acknowledges, "Chief Justice Shepard has involvement in those rules … as part of a collective – the Indiana Supreme Court." Gov't Brief at p.18.

As a Kansas attorney Plaintiff can be disciplined for violation of Indiana's Rules of Professional Conduct in Indiana, Kansas or both. See Kansas and Indiana Rules of Professional Conduct, § 8.5. Thus Plaintiff has standing to mount a facial challenge to the Rules. *See, e.g., Bischoff* (standing analysis in pre-enforcement challenge of state statute)

**"G2 Rule 31 confers immunity on Harrell and Sudrovech"**

Defendants Harrell and Sudrovech move for dismissal based upon the immunity granted them under Rule 31. Plaintiff admits that these JLAP-affiliated officials are protected by good faith immunity, unlike the Board of Law Examiners who enjoy the benefit of absolute immunity (and can thus discriminate at will, for any and all reason, no matter how constitutionally reprehensible.)

The Government alleges that "Brown makes no allegations that either Harrell or Sudrovech's [sic] actions were not done in good faith and in furtherance of the work of JLAP," seeming to argue that bad faith actions undertaken in "furtherance of the work of JLAP" are immunized. Gov't Memo at p. 18. Such is not the case.

Plaintiff intended the following paragraphs to allege  a lack of good faith on the part of Defendants Sudrovech and/or Harrell:  12, 13, 50, 62, 88, 94, 105, 151, 162, 177, 180, 188 – 191, 194, 201, 204, 265.

**"H. Chief Justice Shepard is entitled to absolute judicial immunity from all claims made against him by Brown."**

Plaintiff pleads

11. The Chief Justice of the Indiana Supreme Court, Randall T. Shepard, is sued in his official

capacity as the representative of that Honorable Court.

If the Government is arguing that Defendant Shepard is the wrong state actor to sue regarding those Rules alleged to be unconstitutional then the Government should designate the proper party to defend said Rules. (Plaintiff served the Attorney General as well as the State Supreme Court.)

## "I. Harrell and Sudrovech are entitled to quasi-judicial absolute immunity"

The Government errs in arguing that "Harrell and Sudrovech, like Justice Shepard, possess absolute immunity from suit." Gov't Memo at p.21. The Government's "functional argument" as to Harrell and Sudrovech's level of immunity is undone by the very law that the Government quotes on brief. According to Admission and Discipline Rule 31 § 10, Defendants Sudrovech and Harrell are immune only from civil suit for "official acts done in good faith in furtherance of the Committee's work." The Government seems to argue on brief that this clear grant of good faith immunity is actually a grant of absolute immunity, no matter the motivation, no matter the malice, no matter the charges alleged and no matter the clear wording of the statute.

The Government argues that Defendants Harrell and Sudrovech must, for the good of the Indiana bar, be free from all threat of civil litigation so that they can make "decisions with respect to admission of attorneys to practice law in Indiana" without such encumbrances as the constitutions, tort law and even the Rules of Professional Conduct. It should be noted that the IBLE enjoys such royal immunity and that the system has elected to not so immunize JLAP or its assigns.

Since the laws of Indiana do not set Defendants Sudrovech and Harrell up above all merely human law as the Government argues, for if they were so set up they could, in the words of the Government, saddle applicants of "deeply held religious convictions" with an "observation not a criticism" of their religion using such clinical terms as "Personality Disorder, Not Otherwise Specified" with absolute immunity. See Gov't Brief at p.15.

## "J. There is no damages remedy for the alleged violations of Indiana Constitutional provisions"
Defendant Dr. Ross likewise advances this argument, *infra.*

30

**"K.  These Defendants are immune from suit under the Indiana Tort Claims Act"**

The Government misreads the Complaint as to the tort claims at bar when concluding that the Plaintiff seeks damages in tort from Defendants Sudrovech and Harrell for acts done in their official capacities.  As the Government admits, "there are instances where government employees may be sued individually for acts taken on the job."  Gov't Memo at p.25.  The Government then alleges that "Plaintiff's Complaint does not contain any such allegations ..." arguing that Plaintiff has failed to present allegations that Defendants Sudrovech or Harrell acted "maliciously" or willfully and wantonly or in a fashion that advanced themselves rather than the legitimate goals of their office.  Gov't Memo at p.26.

Plaintiff posits that the following paragraphs allege the requisite lack of good will on the part of Defendants Sudrovech and/or Harrell:  12, 13, 50, 62, 88, 94, 105, 151, 162, 177, 180, 188 – 191, 194, 201, 204, 265.

**"L.  Plaintiff fails to state any legally sustainable claim for conspiracy or collusion"**

Immediately after admitting that allegations of conspiracy and/or collusion to impede constitutional rights is evident at bar and that Plaintiff clearly alleges a conspiracy and brings suit under 42 USC § 1983,  the Government argues that the "complaint taken as a whole [merely] alleges Sudrovech and Harrell referred Brown to Defendants Ross and Bowman for evaluation" and then "provided a summary of the evaluations to the Board of Law Examiners."  Gov't Memo, pp. 27-28.

Given the Government's argument, had Defendants Harrell and Sudrovech conspired to send a black applicant to a known KKK-affiliated mental health provider, obtained a predictably racist evaluation from that mental health provider, and then passed the racially-biased review onto the Examiners without overt comment – as was intended from the beginning – then the black applicant could aver no set of facts passing the Government's review for conspiracy claims as set forth on brief since the conspiracy would be hidden from obvious view and the black applicant could not file factual

31

averments proving that "Sudrovech and Harrell acted together or acted in concert with the other

Defendants in order to act unlawfully." Gov't Memo, p. 28.

At bottom it appears that the Government fails to appreciate the threshold for pleading a

conspiracy under 42 USC § 1983:

> The purpose of § 1983 is to deter state actors, and private individuals in collaboration
> with state officials, from using a "badge of authority" to deprive individuals of rights
> guaranteed by the Constitution. …If such a deprivation occurs, § 1983 provides relief to
> victims who suffer that deprivation…. Specifically, the cause of action requires:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage,
> of any State or Territory, subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for redress.
> []
> To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate
> that: (1) a state official and private individual(s) reached an understanding to deprive
> the plaintiff of his constitutional rights, …; and (2) those individual(s) were " 'willful
> participant[s] in joint activity with the State or its agents.' " …
> … [G]enerally, private individuals act under color of law when jointly acting with a
> state official to deprive some person of his constitutional right,

Fries v. Helpser, 146 F3d 452, 457-58 (7th Cir.1998) (internal cites omitted)

The only question relevant to the conspiracy claims at this stage in the proceedings is whether

Plaintiff has plausibly alleged that Defendants Harrell and/or Sudrovech conspired or colluded with

Defendants Ross and/or Bowman to deprive Plaintiff of a constitutional right.  Such allegations are

found in the Complaint at ¶¶ 56, 74, 76, 94, 103, 126, 166, 172, 179-80, 195 – 202, 207, 265 and in the

oft-repeated formula "evidence of bias, animus and invidious discriminatory intent."

In testing for plausibility one need only consider the aforementioned KKK hypothetical and

replace "black" with "religious," "KKK-affiliated" with "anti-Catholic" and "racist" with "irreligious"

and a plausible theory should be cognizable.  It happened in the former U.S.S.R. with tragic regularity,

and there is nothing in North America's water supply rendering our government officials immune to

such biases.

32

Thus the Government's representation that "There are no allegations that Sudrovech and Harrell acted together or acted in concert with the other Defendants in order to act unlawfully" is simply found lacking in factual predicate.  Gov't Memo at p.28.

**"M.  There has been no tortuous interference with any of Plaintiff's business relationships."**

The Government continues its pattern of ignoring the clear averments in the Plaintiff's Complaint and improperly testifying on brief in an attempt to scuttle the claims of tortuous interference.  The testimony is addressed, *supra.*

After taking full responsibility for the referral to Dr. Bowman, the Government argues that the record contains "no allegations the Plaintiff had a business relationship with Defendant Bowman." Gov't Memo at p.28.

Plaintiff shows the Court the following excerpts from the verified complaint:

14. Dr. Elizabeth Bowman is sued for her alleged private torts, unconscionable contracting and alleged collusions with government actors, the latter being the conduit to alleged liability under 42 USC § 1983.

167.  Plaintiff had retained Dr. Bowman to receive just such a conclusion from her, just as he had from Dr. Ross and Dr. Flueckiger.  Had Plaintiff known of Defendant Sudrovech's directive otherwise he would not have retained Dr. Bowman, just as he would not have retained her had he known of her associations, published materials and focus of her practice.

### III. Rebutting Defendant Dr. Stephen Ross' Arguments

**"A. Plaintiff's Complaint on Its Face Violates the Federal Rules of Procedure" [Ross Memo at pp. 7 – 9**

One of Defendant Ross' lead concerns, as revealed in the first sentence of the conclusion of his brief, is that "Mr. Brown's Complaint against the Defendants suffers from numerous deficiencies in

pleading that should at the least require the Plaintiff to re-plead the Complaint in a manner that will afford the Defendants the opportunity to ascertain the claims against them." Ross Memo at p.25.

Defendant Ross clearly and cogently lays out the facts animating this case at Memo pages 2 – 5, with copious citations to Plaintiff's Complaint. It is a factual recitation with only one glaring error: Dr. Ross did not find, as reported on page 5, that Plaintiff had bipolar disorder, but rather Ross merely opined – with no citation to the source of his opinion other than Plaintiff's religious zeal -- that "[Mr. Brown's] emotional expressiveness and mood variability ... suggested the possibility of a sub-clinical bipolar disorder of a hypomanic type." Other that this one misreading of the facts, counsel for Dr. Ross demonstrates an unencumbered ability to understand the factual allegations of Plaintiffs' Complaint.

Defendant Ross' counsel likewise demonstrates the ability to fully understand the legal claims set forth, as the following litany of quotes from Ross Memo demonstrates:
"Of the 30 counts in the Complaint, 19 of those Counts are directed toward Dr. Ross." Ross Memo at p. 5    The "lengthy allegations" provide sufficient information to [allow subject matter jurisdiction analysis.] *Id.* at p.9. "Plaintiff's Complaint alleges 10 counts against Dr. Ross pursuant to 42 U.S.C. § 1983." *Id.* at p.19. "Plaintiff alleges the Dr. Ross committed 'document conversion' ..." *Id.* at p. 23; "Plaintiff's Complaint alleges three counts against Dr. Ross for violation of his rights under the Indiana Constitution ..." *Id.* at p.23.[5]

Despite this seeming clarity in the facts and legal claims, Defendant Ross opens his motion to dismiss with the allegation that Plaintiff has filed a complaint that the "Defendants cannot be expected to understand." Ross Memo, p.8. As is proved by his grasp of the issues, Defendant Ross sells himself short. He should rather be proud of his ability to delve the alleged mysteries of Plaintiff's complaint.

---

[5] Under Rules of Civil Procedure 8 and 9 – the Rule governing this pleading, the  pleading burden is not onerous. That said, Plaintiff does admit that he faces a standard more rigorous than the following: "Whether Mr. Brown has made sufficient allegations of his constitutional rights being violated is unimportant ..." Id. at 24;

Defendant Ross engaged in the arbitrary practice of counting pages and paragraphs to set forth a series of conclusory attacks on the Complaint that do not point to any one page or paragraph of the Complaint as problematic, but instead alleges that the "gestalt" of the matter is his concern. The whole, he argues, is more confusing than any one part.

Ross claims that "Plaintiff's 47 page, 30 count, 220 paragraph complaint contains so much irrelevant and inconsequential information that Defendants cannot understand the basis of Plaintiff's claims," Ross Memo at p. 8, yet cites not one example of such misinformation. It would appear that Defendant Ross wishes Plaintiff to pare down the size of his complaint (presumably in a manner that fails to reference Dr. Ross in any paragraph or count).

Rather than being merely content to be put on notice in a flat out narrative, Defendant Ross demands that Plaintiff submits a Complaint containing "factual allegations ... directed toward each Count," for anything less than such a detailed trial memo-like pleading leaves Defendant Ross in a legally catatonic state -- unable to "determine the allegations at issue" or file an answer or "proceed with discovery." *Id.*

The numerous instances of Ross' basic ability to grasp the facts and legal claims notwithstanding, Ross argues that the Complaint is "unintelligible" – again with no citation to even one paragraph as an example – and urges the Court to dismiss for that conclusory reason.

Such a dismissal, Ross argues, would be "unexceptional." Ross cites to *United States v. Lockheed-Martin Corp.*, 328 F.3d 374 (7[th]Cir.2003) to support this argument.[6]    Unlike Ross' argument, the Seventh Circuit pointed to evidence of pleading violations within the actual Complaint to make the case of "unintelligibility." Mr. Garst's pleading grants this Honorable Court a standard to calibrate its "dismissal lever" that Defendant seeks to pull.

---

[6] This citation form suggests that even federal government attorneys routinely run afoul of this rule, missing the point that the case Ross cites was not pled by government attorneys but rather as a qui tam action by a pro se litigant. Proper citation would have revealed this crucial clue as that the case was filed as *The United States of American by and through Joseph E. Garst*. It was Mr. Garst, not United States attorneys, that calibrated the scales for the drastic remedy of dismissal under Rule 8 and Rule 9 standards in *Garst v. Lockheed.*

35

Here is but one example of the standard set by Mr. Garst:

> The third amended complaint and statement together equate to 155 double-spaced pages and more than 400 numbered paragraphs, plus 99 attachments. You'd think that all this paper and ink would be enough to narrate at least one false claim. Yet Garst's appellate brief does not extract from the pleadings a single instance of a false statement made to obtain payment. A few selections from the "more definite statement" show why, after four years of overseeing Garst's efforts to plead a claim, the district judge's patience ran out. Here is the first paragraph of the "more definite statement," right under the caption "SPECIFIC FALSE OR FRAUDULENT CLAIMS FOR PAYMENT (SFCFP)" (a caption that shows Garst's love of inscrutable acronyms):

>> Claim for $2,584,926.04, MDS Ex. 1, TAC Ex. 47, submitted on August 9, 1993 and related payments by T.A. Sieverson, Vice-President of Lockheed Integrated Solutions Company, Lockheed Corporation to VA Contracting Officer Steve Stapleton for equipment and service provided during Phase I and Phase II of the OA & MM/ISMS LAN/WAN PROJECT. See TAC ¶¶ 141-181, 217-243, 252, 280-282, 291-295.

> The acronyms alone force readers to look elsewhere. MDS means "More Definite Statement" and "TAC" means "Third Amended Complaint." LAN is local area network, WAN is wide-area network, and PROJECT appears to be the word "project" masquerading as an acronym. What "OA & MM/ISMS" might mean, we have not endeavored to discover. It is not defined anywhere in the more definite statement. To understand the paragraph one would have to read two exhibits and seventy-seven paragraphs scattered throughout the third amended complaint!

*Id.* at 376-77.

Given the above calibration it is understood why Defendant Ross failed to cite to any actually pages or paragraphs of Plaintiff's Complaint and instead merely relies upon conclusory allegations undercut by his own obvious grasp of the Complaint. Defendant Ross can cite no paragraph in Plaintiff's Complaint that fairly compares to Mr. Garst's body of work.

**"B. The Court Lacks Jurisdiction to Hear Plaintiff's Claim under 42 U.S.C. § 1983 as these claims are Barred by the Rooker-Feldman Doctrine ..."**

*See* analysis, *supra.*

**"C. Under the Doctrine of Res Judicata the Court Cannot Hear Plaintiff's Claims under 42 U.S.C. § 1983 and the Indiana Constitution"**

It must first be stated that using *In Re Applicant* 24128, a bid for licensure, as a gravamen for a *res judicata* argument as to anything other than an subsequent bid for licensure is dubious at best. Any

36

comparisons from that action (governed by the Indiana Supreme Court rules and allowing no discovery as well as precious little in the way of due process with federal litigation under the civil rules) is akin to arguing that a traffic court hearing finding one liable for jay walking precludes federal litigation alleging that the jaywalking ticket was merely a pretext for sexual-orientation harassment.

Defendant Ross argues, in effect, that if a bar applicant is discriminated by a well hidden conspiracy – one that is not fully detected in a manner allowing him to plead a cause of action until after the conspiracy has ripened into an adverse judgment against him by the Indiana Supreme Court – then said applicant is without a federal remedy for the alleged civil rights conspiracy since the Indiana Supreme Court either missed the hidden conspiracy or ignored it – or, perhaps, was a party to the conspiracy. (A plausible theory given Indiana's Klannish past as prologue.)

Consider a hypothetical black applicant from the days when Indiana elected a Governor who marched with the KKK. Said hypothetical candidate's file is secretly marked "too dark to license," with this fact remaining unknown to the applicant until after he was denied bar entrance. This applicant, argues Dr. Ross, has no claim under 42 USC § 1983 against the racist conspirators because he could have uncovered their conspiracy (despite it being hidden by definition) and presented it to the Indiana tribunal before their final ruling and thus, the theory goes, found justice. Of course, a lack of discovery and lack of true adversarial litigation in the administrative licensing schemata would hamper the discriminated against black applicant in his quest for the truth, not to mention possible collusion between those operating the Indiana court system and his handlers in the system.

Erwin Chemerinsky references *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 111 S.Ct. 2166 (1991) to support the proposition that

> res judicata and collateral estoppel will turn on factors such as how the issue would be treated in state courts, whether the state proceedings can be characterized as judicial in nature, and whether allowing preclusion would undermine the goals of the federal statute.

37

CHEMERINSKY, §8.10, *Section 1983*, at p.513. According to Chemerinsky, in *Astroria* a unanimous Supreme Court "ruled that the judicially unreviewed administrative findings" should not "have preclusive effect." *Id.* This is probably because administrative findings not subjected to the rigors of true adversarial review can be hijacked to serve prejudicial and unconstitutional aims, as is the allegation at bar.

There is no evidence at bar that the reports of Dr. Ross, Dr. Bowman or Tim Sudrovech were subjected to either a judicial (as opposed to administrative) process or judicial review. (The report of the Bar Examiners was allegedly subjected to judicial review, but that report is not before this Honorable Court.)

Using the framework set forth by Defendant Ross, Res Judicata does not apply to either the hypothetical black applicant's case or the instant politically incorrect applicant's ("too religious") case because:

(1) the identity of those alleged to be the conspirators is not the same as the style of the case before the Indiana Supreme Court; that is, the Bar Examiners are not at bar:

(2) the causes of action are not the same; that is, a *sui generis* appeal of denial by the Bar Examiners on the one hand (not at bar) and civil rights litigation alleging improper activities by those other than the Bar Examiners on the other hand (at bar), and:

(3) a final judgment on the merits of the allegations of conspiracy between the named Defendants is lacking at bar; the Indiana Supreme Court did not even issue findings of facts or conclusions of law and failed to mention any of the herein names Defendants in its upholding of the Bar Examiner's report. Thus one simply cannot discuss what was decided in that, to press the analogies above, "traffic court" like, conspiracy-influenced adjudication.

Therefore, Defendant Ross' appeal to *Res Judicata* under *Highway J Citizens Group v. United States DOT*, 456 F.3d 734 (7th Cir. 2006) is unavailing.

**"D. Plaintiff Cannot State a Claim Upon Which Relief Can Be Granted under 42 USC § 1983 Because Dr. Ross Was Not a State Actor"**

The fact that Defendant Ross has to resort to the wholly improper tendering of testimony in a bid to make his case for dismissal is reason enough to deny his motion to dismiss. His attorneys assure the Court that "Dr. Ross was not controlled and had no contractual relationship with the state, and thus was not a state actor." Ross, p. 18. If Dr. Ross has to resort to such dramatic denials to make his case then he should tender those to the Court in proper format and make his argument in a summary judgment motion. The fact that he must tender this testimony in order to overcome Plaintiff's allegations is fatal to his motion to dismiss for failure to state a cause of action against him.

This above is especially the case given that Dr. Ross recognizes that Plaintiff has alleged a level of collusion between Dr. Ross and the state actors that is cognizable under *Lugar v. Edmonson Oil Co.*, 457 U.S. 922 (1982). In his argument following that admission as to pleading burdens, Defendant Ross argues that Plaintiff has failed to meet his burden under a summary judgment standard – as it often the case among plaintiffs at this early stage in the proceedings. The filing of answers, mandatory disclosures, requests for admissions, interrogatories, production of documents and, finally, deposition testimony should help clarify whether Defendant Ross can deliver on the lack of liability that he improperly proclaims though unsworn testimony and circumstantial evidence such as "If Dr. Ross was in a conspiracy with JLAP to prevent Mr. Brown from being admitted to the bar he would not have recommended that Mr. Brown be able to sit for the bar examination." Ross, p.19.[7]

---

[7] Plaintiff counters that a much stronger case would be made it Dr. Ross could aver that "If Dr. Ross was in a conspiracy with JLAP to prevent Mr. Brown from being admitted to the bar he would not have recommended that Mr. Brown [be remanded for psychiatric evaluation under the theory that his "religious fervor" suggested the possibility of a sub-clinical bipolar disorder of a hypomanic type -- even though no tests for bipolar disorder were administered and no inquires into any bipolar family history were undertaken. Dr. Ross cannot so respond given the record. To retreat to the hypothetical, the one who placed the "too dark to license" note in the black applicant's file could have done so with a firm handshake, generous smile and extension of "best wishes." Such personal pleasantries would not absolve said person of the charge of racial discrimination.

**"E. Plaintiff has Failed to Allege that He was Deprived of a Right Secured by the Constitution of the United States"**

If one assumes that Plaintiff cannot prove his conspiracy claim as to Dr. Ross, then this would be correct. However, at this stage in the pleadings the following must be assumed as true:

265.    Upon information and belief all of the foregoing alleges that Plaintiff was the subject of a conspiracy to fail him through the JLAP process by Defendants and others, including the Doe Defendants, acting in collusion and out of biases, invidious discriminatory intent and animus causing them to target him because of his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

82.    Upon information and belief Plaintiff had been so diagnosed [by Dr. Ross] as an artifice to grant Defendant Sudrovech reason to remand Plaintiff to a state-chosen psychiatrist for further evaluation.

86.    Upon information and belief Plaintiff was denied this work product [by Dr. Ross] because it constitutes evidence of the wrongful use of an iteration of the MMPI-2 9by Dr. Ross on the order of other Defendants] that is generally designed for identifying those of a conservative theological bent in religious ministry.

Defendant Ross' argument as to a lack of harm seems to be, at bottom, akin to "Don't shoot me, I'm just the water boarder." Yet if the water boarding was done in collusion with the government, even outsourced inquisitors can be held responsible for any harm done. Thus if Plaintiff can prove the conspiracy that he alleges (and plaintiffs are routinely afforded a period of discovery to investigate such allegations) then the full conduit to liability as to Dr. Ross may be proved up.

Just as private actors in white sheets taking orders from government officials while burning houses would not be excused from 42 USC § 1983 actions alleging conspiracy, mental health professionals taking orders from government officials while burning careers are likewise amenable to liability under conspiracy theories if the requisite facts and law can be joined.

**"F. Upon Dismissal of Plaintiff's 42 USC § 1983 Claims the Court Lacks Jurisdiction to Hear Plaintiff's State Law Claims"**

Plaintiff agrees that if the Court dismisses all federal claims it should not litigate the pendent state law-based claims. If, on the other hand, the Court fails to dismiss all of the federal claims then

the Court should still maintain jurisdiction over those state claims that form the common nucleus of operative facts, as is set forth in the seminal case of *Moore v. New York Cotton Exchange,* 270 U.S. 593 (1926).

**"G.  Plaintiff has Failed to Allege the Billing Fraud Claims with Adequate Specificity."**

Despite early arguments that Plaintiff pleads too much, Defendant Ross argues in Section G that Plaintiff pleads too little.  Defendant's argument is self-refuting, as is shown when the questions raised are answered via bracketed material:

> "plaintiffs must plead facts related to the 'who, what, when, where and how' of the fraud. … Although it is unclear, Plaintiff appears to have made only one allegation of fraud in paragraph 206 which states, 'Soon after [when] Dr. Ross [who] and Tim Sudrovech [who] brief Dr. Bowman [who], Plaintiff received a bill [what] from Dr. Ross [who] that claimed [how] to be more than four months overdue [when, how, even why].  Plaintiff [who] paid [what] the $175 under protest [how]."

The where is limited by the complaint's statement of venue.  Defendant Ross is given enough to focus his gaze upon the $175 billing he sent to Plaintiff – the one that Plaintiff paid under protest. This is sufficient as to meet the pleading standards incident to the "billing fraud" allegations.

Defendant Ross again conflates the motion to dismiss standard with the summary judgment standard when he argues that Plaintiff must lay out his entire case in his pleadings.  The prima facia case of fraud that Defendants demands at Ross, p.22 needs not be spelled out in the opening salvo of a case – it is what the Plaintiff must "prove" in order to survive a summary judgment motion. *Lawson v. Hale*, 902 NE 2d 267 (Ind.App.2009).

Defendant Ross likewise misinterprets Indiana's Deceptive Consumer Sales Act when he argues that he can unilaterally alter and retender billing and not run afoul of this protective legislation. The Act is to be "liberally construed" to "protect consumers" from deceptive and unconscionable sales acts" and so "encourage fair consumer sales practices."   Indiana Code § 24-5-.05-1  The tendering bogus bills certainly falls within the ambit of this prohibition.

41

The Deceptive Sales Act governs supplies in "business, vocation or occupation," Lawson, 902 NE 2d at 272, and is not limited to point of purchase sales of goods, as Defendant argues. Defendant Ross offers a "service" in his "occupation" and so falls under the Act. Indiana Code § 24-5-.05-2. Liberally construed, the demand for payment of unilaterally amended billing in a manner alleged to be fraud could fall under the following paragraphs of the Act:    Indiana Code § 24-5-.05- 3(a)(1), (5), (8), (14) and -3(b).[8]

**"H. Plaintiff has Failed to State a Claim Upon Which Relief Can Be Granted as to the Conversion Claim."**

Defendant Ross' conversion argument is self-refuting. He demands that Plaintiff alleges that Defendant was involved in the "appropriation of the personal property [of Brown] ... exercising dominion over it, ... withholding it from his possession, under a claim of title inconsistent with the owner's." *Computers Unlimited v. Midwest Data Sys.*, 657 N.E.2d 165, 171 (Ind.Ct.App.1995).

Defendant Ross describes the property at issues as "Mr. Brown's notes," that the Defendant "refused to surrender" to Plaintiff Brown. Ross Memo, p.23. Defendant acknowledges that Plaintiff has alleged that "Dr. Ross failed to turn over Mr. Brown's handwritten notes." Id.

It is apparent that Defendant Ross is on notice as to the conversion claim. He seeks to prevail as a matter of law by arguing that "Plaintiff has made no allegations to show that these notes were the property in which Mr. Brown would have been the lawful possessor."    Plaintiff counters that (1) such

---

[8] If the above is insufficient to satisfy the Rule 9 standard then Plaintiff is willing to amend and append the actual allegedly duplicitous billing statements demonstrating the alteration of records some four months after the original billing was paid in full and more fully set forth (in a fashion intended to survive review under a summary judgment standard) the allegation that this fraudulent action allowed Defendant to gain an additional $175 from an economically distressed and protesting Plaintiff at a time of government-created duress that was fully known to the Defendant.

is not his burden at this stage in the proceedings, and (2) Defendant's use of apostrophes after Plaintiff's name in the same paragraph undoes Defendant's argument.[9]

### "I. There is no Private Right of Action under the Indiana Constitution"

Defendant argues mostly from search and seizure cases seeking monetary damages to make to the point, which Plaintiff does not challenge, that there is no cause of action for money damages under the Indiana Constitution when goods are seized or privacy violated.

Plaintiff brings no such claims and seeks no such damages under the Indiana Constitution.

Defendant Ross rightly directs the Court's attention to *Cantrell v. Morris*, 849 N.E.2d 488 (Ind.2006) for this evaluation, but misreads that case in the context of personal liberties other than property and privacy.

The Indiana Supreme Court ruled as narrowly as possible in *Cantrell*, reframing the general principle question put to them by the federal court into this tightly packed and narrowly tailored issue presented: "Does an employee of a state or local governmental agency whose discharge is alleged to have violated rights of free speech guaranteed by Article I, Section 9 of the Indiana Constitution assert a claim for money damages against the unit of government or any individual responsible for the firing, and, if so, what is the source of that claim and what are its elements?

Since the present case does not involve a government employer, a state employee, a termination, or a claim for monetary damages under the constitutional provision the leading Indiana court case on the private right of action under the Indiana constitution offers this Court little guidance under the facts at bar, if any.

That said, the Indiana Supreme Court has rejected the idea that the Free Speech provision (and, by implication, amendments protecting religious belief and conscience) has no place on the Court's docket except when enacted laws are directly challenged. In other words, the Indiana Court has left

---

[9]   Given that the Court has agreed to a F.R.C.P. 12(c) analysis at bar, all that Defendant Ross would have to do to moot this claim would be to file the original of these notes with the Court.

open room to litigate constitutional torts arising out of Section 9 and, by implication, other articles of Indiana's organic document:

> the State argues that a violation of Section 9 requires the passage of a statute, so there can be no violation of this provision for terminating employment. We have held, however, that the executive branch is subject to Section 9. *Whittington v. State,* 669 N.E.2d 1363, 1370 (Ind.1996) (an individual's right to speak was not violated when he was arrested for speaking loudly toward a private individual, not the police officers during a reported domestic dispute investigation); *Price v. State,* 622 N.E.2d 954, 960 (Ind.1993) (police officers cannot materially burden an individual's opportunity to engage in political expression).

*Id.* at 493.  Note that the latter case stands for the proposition that state actors – and, by implication, those private actors with whom they collude – can violate Section 9 in a manner resulting in a justiciable case.  In other words, Defendant Ross errs in positing that "Mr. Brown does not have a right to pursue a private cause of action under the Indiana Constitution."  Ross Memo, p.24.  Plaintiff may indeed pursue such a cause of action against government actors, Dr. Ross included if he, through involvement in a conspiracy, cloaked himself with governmental authority  -- as is plausible alleged at bar.

## IV. Rebutting Defendant Elizabeth Bowman's Arguments

### " *II. Statement of Facts*"

Defendant Dr. Bowman takes many liberties with the facts, smoothing and framing them as Defendants are wont to do in motions to dismiss.  Plaintiff must take an exception to one sentence in particular.  Defendant Bowman claims, through counsel, that she found Plaintiff, on top of "personality disorder not otherwise specified" (a.k.a. Roman Catholicism) to "suffer[] from narcissism and obsessive compulsive disorder."  B'man Memo at p.2.  The Bowman report did not so conclude, and Plaintiff must voice his concern regarding ad hominine attacks that are disguised as arguments on brief alleging  "mental illness" beyond that which was diagnosed by Dr. Bowman and Dr. Bowman alone.  (All others having issued no diagnosis, see complaint.)  Dr. Bowman likewise misstates the record on brief at p.17, there alleging that "she disagreed with Dr. Ross' diagnosis of bipolar."  [sic]  Dr. Ross

44

did not diagnosis Plaintiff with "bipolar." Once again, all Dr. Bowman's counsel need do is read his client's report to refrain from mislabeling the opposing party as to mental illness – hopefully this is not an expectation too high given the parties' past as prologue.

Also addressing the facts, Defendant Bowman has broken the seal on the discovery process, having done so before filing her motion to dismiss. She did this by subpoenaing Plaintiff's testimony before the June 1, 2009 hearing of the Board of Law Examiners as well as their final report as to Plaintiff's application. Dr. Bowman ostensibly uses the information gained in her "no harm, no foul" argument against Plaintiff's damages as to defamation, arguing that her misrepresentation of Dr William Alexy's non-diagnosis to instead support her diagnosis did not harm to Plaintiff. In that argument Dr. Bowman alleges the following:

> The Board of Law Examiners did not deny [Plaintiff's] application for the [Indiana] bar as a result of Dr. Alexy's [allegedly fabricated by Bowman] conclusion that Mr. Brown suffered from personality disorder not otherwise specified. The Board of Law Examiners rejected his bid to sit for the Indiana bar because Mr. Brown "testified [as] to his obligation to disobey laws that contradicted his religious beliefs under certain circumstances."

The bracketed material above makes clear what Dr. Bowman left unclear on brief. That is this: there is no evidence at bar that any of the more than five professional mental health authorities who evaluated Plaintiff found any cause to label him mentally ill save Dr. Bowman, and she did that only through the label of "personality disorder not otherwise specified" while misrepresenting, in an official report filed with the government, that Dr. William Alexy had said the same. Defendants Harrell and Sudrovech, upon learning of this material misrepresentation, were fine with it.

While the Plaintiff would be honored to learn that it was his testimony of his religious faith and his testimony alone that caused the harm pled in this action, he must posit that the record does not allow Dr. Bowman that safe haven. Harm is assigned to the alleged conspiracy at bar, and Plaintiff alleges that the misstating of diagnoses, as evidenced both in the complaint and in Dr. Bowman's briefing, is part and parcel of the conspiracy.

45

**"A. Mr. Brown's Claims Arising Under the United States Constitution Fail As A Matter of Law."**

**"1. Mr. Brown's Conspiracy Claims Pursuant to 42 USC § 1983 Fail as a Matter of Law"**
**"a. Dr. Bowman was not Acting "Under the Color of State Law."**

The analysis at this point in the process is not whether she was so acting, the analysis is whether the plaintiff has presented facts that could result, if true, in a determination that she was so acting.

Plaintiff has pled such facts.

166. Defendant Bowman told Plaintiff that during the pro-briefing Defendant Sudrovech had instructed her to not record a final conclusion as to Plaintiff's ability to pass Rule 12 analysis as both Dr. Ross and Dr. Flueckiger had done. Defendant Sudrovech rather ordered Defendant Bowman to leave the question open to be addressed by his final report.

195. Upon information and belief Defendant Tim Sudrovech received the Bowman report, a report that he and/or Defendant Harrell had "front-loaded" through pre-evaluation discussions with Dr. Bowman, joined by Dr. Ross,

207. Defendants Dr. Bowman and Dr. Ross were vested with governmental authority through their willing collusion and close working relationship with Defendants Sudrovech and/or Harrell.

265. Upon information and belief all of the foregoing alleges that Plaintiff was the subject of a conspiracy to fail him through the JLAP process by Defendants and others, including the Doe Defendants, acting in collusion and out of biases, invidious discriminatory intent and animus causing them to target him because of his pro-life beliefs arising out of his traditional Christian worldview and constitutional, conservative political perspective.

Dr. Bowman rests her summary judgment-like argument (*but see* the Standards of Review, *supra*) upon inapposite case law, including the superseded *Rouse v. Judges of the Circuit Court*, 609 F. Supp. 243 (N.D.Ill.1985), which is wrongly cited as "*Ralphs v. Judges*" in Bowman's brief.

The three and a half pages used to set forth this argument were unnecessary since Dr. Bowman admits, in the final lines of this section, that she "*at best, acted with state authority.*" B'man Memo, p.8. This admission comports with the plaintiff's allegations and demonstrates that is it reasonable to assume that the Plaintiff can prove this allegation.

Since acting with state authority is acting under the color of law, section A.1.a of Bowman's brief can be ignored by the Court at this early stage in the proceedings. Her argument fails as a matter of law on her own admission.

**Note: There is no "1(b)" in the Bowman argument.**

### "2. Dr. Bowman is Immune from § 1983 Liability."
### "a. Dr. Bowman is Immune under the 'Functional Approach.'"

Dr. Bowman spends five and a half pages arguing that she is, in essence, judge-like in her status since she is "closely associated with the judicial system" B'man Memo, p. 8 and functions, in essence, as an "arm of the court." *Id.* at 9.

Dr Bowman simply has neither the robes nor the judicial standing to claim a niche in that exalted pantheon afforded "absolute immunity," even under the urged *Cleavinger v. Saxner,* 474 U.S. 193(1985) functional analysis (as utilized in *Eisenberg v. Sternberg*, 641 F.Supp. 620 (W.D. Wisc., 1986)

An official is entitled to absolute immunity if: (1) the official's judgments are functionally comparable to those of a judge; (2) the nature of the controversy in which the official is forced to become a participant is sufficiently intense that there is a realistic prospect of continuing harassment or intimidation by disappointed litigants; and (3) the system in which the official operates contains safeguards adequate "to reduce the need for private damage actions as a means of controlling unconstitutional conduct," including insulation from political influence, adversarial proceedings, a written record including the decision maker's findings and conclusions, and the correct ability of error on appeal.

This bridge to absolute immunity fails on prong one.

By her own admission Dr. Bowman decided nothing – in fact, "[she] did not even make a recommendation as to whether of not Brown was fit to sit before the bar or practice law." Memo at

p.17. This is not judgelike decision making. Indeed, Dr. Bowman goes so far as to argue that she even disagreed with the final conclusion of the actual "deciders" at bar as to Plaintiff's bar-worthiness. *Id.*

The bridge to absolute immunity likewise fails on prong 2. Dr Bowman argues that being held responsible in a federal court litigation constitutes "harassment or intimidation" p.12-13 demonstrates nothing other elitist thinking. While the military-industrial complex is known to argue national security as a bridge to freedom from litigation incident to its inquisitions, it appears that Dr. Bowman merely argues that she is above the law due to her elevated status as a government-preferred (at least when religious dissidents are being probed) psychiatrist. Such is not the test under this prong. All Americans are allegedly equal before the law and being held responsible for one's alleged torts and other assorted psychiatric waterboardings do not constitute incidents of harassment or intimidation, no matter how inconvenient personal accountability though legal process may be.

The bridge to absolute immunity also fails on prong three. Defendant Dr. Bowman argues that granting her absolute immunity would be worth the risk of omissions and errors since her mission to safeguard the public from "incompetent, impaired or unethical lawyers" (and, presumably, "pro-life") is so great. Yet the allegations at bar include "political influence," a lack of valid adversarial review, falsification of written reports with no recourse and government-favoritism/collusion that allows for no correction on review. These great risks and lack of safeguards bar the path under prong three.

If Dr. Bowman is correct in her claim to functional absolute immunity then that would be cause "private damage actions" are unneeded under the facts at bar. Yet even the lead case Dr. Bowman relies upon in her argument did not adopt such a legal conclusion:

> It is true that orders of a state court relating to the admission, discipline, or disbarment of members of its bar may be reviewed only by the United States Supreme Court. *MacKay v. Nesbett,* 412 F.2d 846 (9th Cir.1969). ***However, plaintiff's action states claims for relief under § 1983 and does not seek review of the state court judgment. It is a personal action for damages against the defendants alleging among other things a conspiracy to deprive plaintiff of his civil rights.*** Accordingly, jurisdiction is proper under 28 U.S.C. § 1343(3).

48

*Eisenberg*, 641 F.Supp. at 624 (emphasis added). If Donald Eisenberg successfully pled such a 42 USC § 1983 case against his alleged "waterboarders" -- who were the equivalent of the Indiana Board of Law Examiners – at least as to opening the courthouse door – then Dr. Bowman's argument that such a case is unnecessary under the instant facts fails. Prong three is defeated.[10]

In *McConnell v. McKillip*, 573 F.Supp.2d 1090 (S.D.IN 2008) the Court concluded that the Board of Public Works and Safety of the City of Kokomo members' actions were functionally an adjudicatory matter and thus granted them "absolute quasi-judicial immunity." *Id.* at 1100. The Court found that:

(1) the Board members presided over a truly adversarial hearing open to the public. Plaintiff's time with Defendant Bowman and the other Defendants' clinical processing of the Bowman report was just the opposite.

(2) "[a]ny final determination of the Board is subject to judicial review." There is no judicial review afforded the Bowman, Ross or Sudrovech reports – merely review of the Bar Examiner's second hand interpretation of the same. Given an adversarial setting and judicial review, the court determined that the duties of the  "Board members are functionally comparable to those performed by judges. " *Id.* Lacking such a setting and review must result in the opposite conclusion.

Dr. Bowman's body of work at bar and the way in which was reviewed allows no parallel to acts compared by judges in the American tradition.  Dr. Bowman advances no viable claim for immunity under the "functional approach." (Neither can the other Defendants, save Judge Randall Shepard, who enjoys absolute immunity by statute and centuries of common law.)  Bowman's arguments fail as a matter of law.

---

[10] Note that *Eisenberg* also undercuts Defendants' arguments on Rooker-Feldman and the pleading of conspiracies under 42 USC § 1983. *Eisenberg*, standing alone, grants the Court sufficient warrant to order that answers be filed in the instant action.

Dr. Bowman's argument for judicial-like immunity also carries within it a separate argument for witness-like immunity. *See* B'man Memo, pp. 11- 12. This argument will be dealt with later in this briefing.

**"2. Dr. Bowman is Immune from § 1983 Liability."**
  **"b. Dr. Bowman is Entitle to Eleventh Amendment Immunity."**

Legal arguments resting upon superseded precedent often lack merit. Dr. Bowman's appeal to the Eleventh Amendment through the superseded case of *Pennhurst State School and Hospital v. Halberman*, 465 U.S. 89 (1984) is no exception to that rule. *See Joshua B. v. New Trier High School Dist*. 203, 770 F.Supp. 431 (N.D.Ill.1991). Dr. Bowman advances no viable claim for immunity under the Eleventh Amendment. Her arguments fail as a matter of law. *See* Eleventh Amendment argument, *supra.*

**(A) "3. To the Extent that Mr. Brown Seeks Damages Against Dr. Bowman in her Individual**
    **Capacity, Mr. Brown has Failed to State a Claim for Conspiracy Under 42 USC § 1983.**
    **(D)(3) Mr. Brown's Legal Claims for Constructive Fraud Fail as a Matter of Law.**
    **(D)(4) Mr. Brown's Legal Claims for Actual Fraud Similarly Fail as a Matter of Law"**

All of the above sections of the Bowman brief are answered herein:

Dr. Bowman, like the government, asks more of Plaintiff's pleadings than should be at this stage in the proceedings. Like the government, Dr. Bowman failed to set forth the standard of review. This likewise contributed to briefing that demands of Plaintiff much more than mere notice of claims under Fed.R.Civ.P. 8. Defendant Bowman instead demands that Plaintiff brings forth "evidence" to, *inter alia*, (1)"sustain a claim" (p.5), (2) "establish a civil conspiracy" (p.17), (3) prove Dr. Bowman's subjective "intent" (p.19), (4) validate an allegedly clandestine "agreement or understanding" (p.20), (5) prove an "intent to deceive" (p.29), (6) prove "that plaintiff and defendants entered into a contract" (p.30), (7) "prove by a preponderance of the evidence" his defamation claim, (p.32), (8) show "facts to suggest … negligence" (p.33), (9) "substantiate how he was damaged" (p.33), (10) and, perhaps most glaringly against the great weight of all known standards under Rule 12(b)(6), "prove[] on the face of

50

his Complaint" the following subjectively-known criteria: "malice, bad faith or conspiracy." *Id.* at fn. 11.

Plaintiff must admit that without the filing of a responsive answer and without discovery he faces a daunting task – nigh impossible – in satisfying Defendant Bowman's subjectivist-anchored demands.[11] It is likely for that reason that the federal judiciary allows notice pleading.

Defendant Ross complains (in the main) that Plaintiff pleads far too much. Defendant Bowman complains that Plaintiff pleads far too little. The government takes no position on the issue. Plaintiff responds that he was caught between Rule 8 (notice pleading) and Rule 9 (fraud standards) and believes that he pled, to quote an Ursidaen authority on such balancing tests, "just right."

Dr. Bowman mischaracterizes Plaintiff's pleadings in a bid to discredit the same, going so far as to claims that "there is nothing " in the complaint "to suggest any agreement between Dr. Bowman and the Indiana Board of Law Examiners, any concerted effort between the two, or any improper influence." B'man Memo at p.17. Since the Indiana Board of Law Examiners is not at bar this straw man argument is unavailing. Indeed, the proper noun "Politburo" could have been just as effective on brief. What is rather crucial is to note that Plaintiff did plead, with Rule 9's demand for particularity, his claims of fraud and deception against Dr. Bowman, and those paragraphs, interpreted in light of the proper standard of review, moot Dr. Bowman's arguments.

**"(D) Mr. Brown's State Law Claims" (Bowman)**
   **1. Mr. Brown's state law claims are superseded by the Medical Malpractice Act. (Bowman)"**

Bowman argues throughout her brief that Plaintiff is her patient for purposes of this act, noting that "a 'patient' under the Act ... received health care ... under a contract, express or implied." B'man

---

[11]"Bad faith": The opposite of "good faith", generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or other contractual obligation, not prompted by an honest mistake as to one's rights, but by some interested or sinister motive. ... "bad faith" is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." BLACK'S LAW DICTIONARY (6th ed)

Memo, p.23.  Dr. Bowman demands, pursuant to this Act, that Plaintiff "put forth competent evidence of ... misdiagnosis in the form of expert testimony" in his pleadings, seeming to argue that Plaintiff has not done so.  Plaintiff directs Defendant Bowman to the following paragraphs:

### 2. "Dr. Bowman's Services to Mr. Brown Did Not Constitute a Consumer Transaction and, Therefore, his Claim for 'Incurable Deceptive Act' is Without Merit"

Dr. Bowman misstates the allegations at bar, missing in his analysis of this claim the most crucial deceptive statement at bar.  Inexplicably, while Defendant Bowman repeatedly failed to note that statement in the body of her brief she did note it at footnote 10.  The legal effect of this allegation should not be understated.

In this section Dr. Bowman improperly testifies on brief that she "does not regularly engage in or solicit consumer transactions" and that her services to Plaintiff were for, she assures the court, a "professional purpose" as opposed to personal purpose.  Plaintiff objects to this testimony and posits that the need to make such a factual argument to move the court to dismiss the claim at issue is proof that the allegations at bar are sufficient to survive review under FRCP 12.

### 5. "Mr. Brown's Claims for 'Substantive Unconscionability' Fail as a Matter of Law"

Defendant Bowman finds fault in Plaintiff's compliant for failing to, *inter alia,* "adequately apprise Dr. Bowman of the terms of the contract, the price, or any information regarding the parties' relative bargaining power."  B'man Memo at p. 30.  Plaintiff responds that the latter is set forth in quite some detail in the complaint.  As for the terms and price, Plaintiff pledges to share that information with Dr. Bowman just as soon as she tenders it to him pursuant to a request for documents under Fed.R.Civ.P. 34.

Dr. Bowman further argues that her counsel has never personally witnessed a "substantive unconscionably" claim asserted in any context other than defensive briefing and so such a claim must not exist at law.  Plaintiff responds that there is a first time for everything.

52

**6. "Mr. Brown's Claim for "Malicious Defamation" Fails as a Matter of Law."**

Dr. Bowman informs the Court that since Plaintiff cannot, at this initial point in the litigation, prove that she "knew" her allegedly false statement about what was in Dr. Alexy's report was false or even that she failed to expend the effort (*i.e.* read the very report that she ordered) to determine if it was true or false his defamation claim must be dismissed "as a matter of law." This argument, like many raised by the Defendants, is self-refuting.

Dr. Bowman likewise argues that since "Mr. Brown cannot substantiate" that he was damaged by an alleged lie in the Bowman report his claim must be dismissed ahead of any answer. In keeping with such thinking, Dr. Bowman further argues that she could have included any misrepresentation in her report, no matter how reprehensible, and still been immune from litigation for she enjoys "absolute immunity," even when misrepresenting her clients' mental health in officially-tendered reports. (Defendant Bowman does concede that she does not enjoy such claimed immunity it malice is "proven on the face" of her former client's complaint." See B'man Memo, footnote 10.

**"E. The Court Should Abstain Pursuant to Rooker/Feldman or Younger"**

Rooker-Feldman abstention is briefed, *supra.*

Younger Abstention simply does not apply to the facts at bar. Professor Chemerinsky defines the necessary step into Younger abstention analysis: A defendants must raise Younger in alleging a risk of federal interference with an ongoing state proceeding. CHEMERISKY, § 13.1, *Abstention to Avoid Interference*, p. 716. If a similar abstention doctrine is to be applied that would likely be *Colorado River* abstention, from *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) comes into play where parallel civil litigation is being carried out, particularly where simultaneously-filed federal and state court proceedings are being carried out to determine the rights of parties with respect to the same questions of law. Under such circumstances, it makes little sense for two courts to expend the time and effort to achieve a resolution of the question.

Neither abstention doctrine applies under the situation at bar, since the JLAP processing is completed and no relief could thus enter into an ongoing process.

Dr. Bowman's appeal to *Crenshaw v. The Supreme Court of Indiana*, 170 F.3d 725 (7thCir.1999) is likewise unavailing. As Plaintiff pointed out in the introduction of this briefing, any case against a state supreme court or board of law examiners in inapposite given that this case is brought against no such defendants. Ms. Crenshaw fell under the abstention doctrine articulated by *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432-37 (1982) because she attempted to take the disciplinary authority and Indiana Supreme Court into federal court to quash a subpoena in a process yet ongoing.

In abstaining from exercising jurisdiction over Ms. Crenshaw's suit, the district court determined that the Commission's investigation satisfied the three-part test in *Middlesex:* The ongoing investigative proceeding (1) was "judicial in nature"; (2) implicated important state interests; and (3) allowed Ms. Crenshaw an adequate opportunity to raise constitutional challenges.

As is demonstrated, supra, none of these three prongs apply to the not ongoing case at bar. JLAP's processing is not judicial in nature, the interests implicated are more federal than state (indeed, the state can locate no constitutional remedies applicable given the allegations at bar), and Plaintiff has never been granted the opportunity to raise constitutional challenges to the actions of the Defendants at bar in a venue of competent jurisdiction. As the Seventh Circuit holds, "When confronted with circumstances that clearly implicate Younger concerns, a federal court must abstain." *Barichello v. McDonald,* 98 F.3d 948, 955 (7th Cir.1996). This "not ongoing" case presents no circumstances that even remotely implicate Younger concerns, and thus the Defendants appeal for defacto absolute immunity via a dismissal of all claims pursuant to abstention doctrines must be denied.

# CONCLUSION

The Defendants have failed to show why any claims in the present litigation should be dismissed as a matter of law.  Defendants' prayers for relief should be denied.

Respectfully Submitted,

Bryan J. Brown
827 Webster Street
Fort Wayne, IN 46802
(260) 515-8511
Brown1634@gmail.com

### Certificate of Service

I hereby certify that on March 29, 2010 I delivered, via first class mail, file stamped copies of this document to the following:

Mark Baeverstad
Rothberg , Logan & Warsco, LLP
505 East Washington Blvd.
Fort Wayne, IN 46859-1647

Laura L Bowker
Office of Attorney General
Gregory F. Zoeller
Indiana Govt Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204-2770

Stephen M. Brandenburg
Johnson and Bell, Ltd.
1435 E. 85th Avenue
Merryville, IN 46410

Bryan J. Brown

55